Emerson EMORY, Captain, USNR
(Ret.), Plaintiff,

v.

SECRETARY OF THE
NAVY, Defendant.

Civ. A. No. 83–2494.

United States District Court,
District of Columbia.

March 22, 1989.

Emerson Emory, pro se.

Bradley L. Kelly, Asst. U.S. Atty., Washington, D.C., for defendant.

OPINION

JUNE L. GREEN, District Judge.

Plaintiff Dr. Emerson Emory, a black captain in the United States Naval Reserve Medical Corps (Retired), brought this action *pro se* against the Secretary of the Navy, claiming violations of the fifth and fourteenth amendments to the United States Constitution and violations of the Civil Rights Acts. Plaintiff seeks declaratory and injunctive relief for alleged discrimination that resulted in his nonselection for promotion to the rank of rear admiral in the United States Naval Reserve.

This Court initially dismissed plaintiff's claim as nonjusticiable. The United States Court of Appeals for the District of Columbia Circuit reversed and remanded. *Emory v. Secretary of Navy*, 819 F.2d 291 (D.C.Cir.1987). A trial to the Court was held upon remand to determine whether or not plaintiff's constitutional rights had been violated. For the reasons stated below, the Court finds in favor of the defendant.

## I. *Findings of Fact*

Plaintiff was commissioned as an ensign in the Medical Corps of the United States Naval Reserve in 1949. He continued as a Reserve officer from that time until his voluntary retirement effective December 1, 1979. In the interim, he was promoted in the normal sequence to the rank of captain, obtaining that status in 1972. Thereafter, he was considered, but not selected, for promotion to the rank of rear admiral by selection boards meeting in January of 1977,[1] 1978, 1979, as well as October 1979. Prior to the next rear admiral promotion selection board, plaintiff requested to be transferred to the Retired Reserve List.[2]

From 1977–1979, plaintiff was eligible for promotion to the rank of rear admiral. During this time, active duty Reserve officer promotion zones were inextricably bound to the promotion zones of the unrestricted line active duty officer of the Navy. This connection is based on the concept of "running mates." While the number of unrestricted line active duty officers promoted was determined by the statistical or historical analyses of the prospective needs of the Navy, Reserve officers did not come into the eligibility zone for promotion until their particular "running mate" in the active duty Navy came into the zone. An officer's "running mate" could change identity from time to time as a result of attrition in either the regular Navy or the Reserve.

During the 1977–79 time period, the Navy divided the total "eligibility zone" into three divisions: (1) the primary promotion zone; (2) above the zone; and (3) below the zone.[3] The "primary promotion zone" consisted of those officers ripe for promotion. This zone could not contain anyone who had been considered but not selected for promotion while a member of the primary zone in any previous year. The names in any current year's primary zone would start at the end of the previous year's primary zone on the lineal list of those eligible for promotion in the Navy.

Those officers previously considered but not selected for promotion, while in the primary zone, were considered to be "above the zone." An officer who was considered but not selected by a promotion selection board while he or she was either above the zone or in the primary zone was considered to have "failed of selection." Any officer who twice failed of selection would be required to leave the naval service or, if eligible, retire.

The third zone, "below the zone," consisted of those junior officers who were deemed especially well qualified. This gave these officers an opportunity for early advancement before they were in the primary promotion zone. An officer not selected for promotion while below the zone is not considered to have "failed of selection."

These three zones constitute the entire "eligibility zone." An officer not in any of these zones would not be eligible for promotion and could not be chosen by a selection board.

Plaintiff was not in the eligibility zone for promotion to rear admiral until January of 1977 when he entered below the zone. Plaintiff would not have been in the pri-

---

**1.** The Court is not reviewing the decision of the January 1977 selection board since it is beyond the six-year statute of limitations. *See* Order entered Oct. 6, 1988.

**2.** Plaintiff was convicted and sentenced in a federal district court to twelve years in prison for one count of conspiring to acquire illegally or obtain possession of Dilaudid, a controlled substance, and twenty counts of unlawfully dispensing Dilaudid. By a letter dated October 19, 1979, plaintiff was informed by the Chief of Naval Personnel that the conviction raised "serious doubt regarding your suitability for continued service as a commissioned officer." A board of officers was to consider his retention in, or separation from, the Naval Reserve. Plaintiff was also informed that he was eligible for transfer to the Retired Reserve List without pay. *See* Naval Reserve Service Record of Captain Emerson Emory, MC, USNR at 267. Plaintiff chose to retire.

**3.** The findings as to the various eligibility zones are taken from the testimony of Lieutenant Commander Peter F. Frost at a hearing in this Court on October 13, 1988, and from the declaration of Captain D.K. Skillman of the United States Naval Reserve. *See* Plaintiff's Trial Exhibit 3.

mary promotion zone until September of 1980 and as a result, he never "failed of selection."

Each selection board receives a lineal list of the officers eligible for promotion. The first name on the list is the most senior officer.[4] The greater the number, the more junior the officer. In January of 1978, the selection board recommended that Park W. Willis, III and John Robert Senior be promoted to the grade of rear admiral. *See* Defendant's Trial Exhibit D at 5. There were 116 officers eligible for promotion. Captain Willis was above the zone at number 12 on the lineal list and Captain Senior was below the zone at number 62. *Id.* at 13, 15. Plaintiff was also below the zone at number 90. *Id.* at 16. The primary zone consisted of numbers 23–31.

In January of 1979, the selection board recommended that Henry Turner Edmondson, Jr. be promoted to the grade of rear admiral. *See* Defendant's Trial Exhibit E at 4. There were 119 officers eligible for promotion. Captain Edmondson was below the zone at number 55, while plaintiff was also below the zone at number 69. *Id.* at 14. The primary zone consisted of numbers 21–38.

In October of 1979, the selection board recommended that Joseph Hardy Miller be promoted to the grade of rear admiral. *See* Defendant's Trial Exhibit F at 9. There were 151 officers eligible for promotion. Captain Miller was below the zone at number 49, while plaintiff was also below the zone at number 55. *Id.* at 19. The primary zone consisted of numbers 31–48.

None of these promotion boards contained any black rear admirals. In fact, there were no black rear admirals in the Medical Corps at that time. No junior officer was promoted over plaintiff since all of the officers promoted were a lesser number on the lineal list for selection than plaintiff.

Each selection board consisted entirely of Medical Corps officers and had adequate representation of Reserve officers. The January 1978 board had three Reserve rear admirals (one retired), two Regular rear admirals (one retired), a recorder, and an assistant recorder. The January 1979 board had four Reserve rear admirals (one retired), one Regular rear admiral, a recorder, and two assistant recorders (one of whom was black). The October 1979 board had three Reserve rear admirals, two Regular rear admirals (one retired), a recorder, and an assistant recorder. Voting members of the selection board must be of a higher rank than those who are to be selected.

On June 8, 1982, more than two and one-half years after he retired, plaintiff petitioned the Board of Correction of Naval Records (BCNR) to promote him to the rank of rear admiral. *See* Defendant's Trial Exhibit G. He listed a variety of activities that he performed in support of the Navy and stated that he "[felt] that these activities surpassed any of the officers selected during those years and that [he] should have been selected for promotion." *Id.* Plaintiff did not mention any discrimination claims and did not request that any actual records be corrected. BCNR replied by letter of June 25, 1982, advising plaintiff that it lacked the power to promote him to rear admiral. *See* Defendant's Trial Exhibit H. On July 14, 1982, plaintiff wrote BCNR again and for the first time claimed that his failure to be selected for promotion was due to the racial bias that resulted from no black sitting on the selection board. *See* Defendant's Trial Exhibit I. BCNR replied immediately on July 20, 1982, reiterating that the Board could not correct plaintiff's record to show that he was promoted to rear admiral.

On August 24, 1983, plaintiff filed with this Court, seeking retroactive appointment to the grade of rear admiral, but waiving any back pay which would be due. Plaintiff seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 that defendant's acts violated plaintiff's rights under the fifth and fourteenth amendments to the Constitution and under the Civil Rights Acts.

---

**4.** Testimony of Captain D.K. Skillman, USNR, at trial on October 19, 1988, afternoon session.

## II. *Conclusions of Law*

### A. Composition of Selection Boards

Plaintiff alleges that the selection boards that considered him for promotion were improperly composed because they had no blacks on them. Defendant claims that plaintiff has failed to proffer any evidence that the boards that considered him were composed in violation of any statute or regulation. Defendant also claims that plaintiff has failed to point to any congressional or naval mandate that requires selection boards to have minority representation in order to be validly composed.

The only policy in place during the time that plaintiff was considered for promotion was an internal Chief of Naval Personnel memorandum to the Assistant Chief of Naval Personnel for the Naval Reserve, dated July 3, 1975, along with an attachment of additional policies. *See* Defendant's Trial Exhibit B. In the attachment, subdivision 3 entitled "Minority Officers" provides:

a. Minority representation, preferably as a voting member, *should* be on the following boards as a minimum:

All promotion selection boards

. . . .

b. Minority representation is *also desired* on all other boards which have five or more minority candidates under consideration.

c. The requirement for minority representation on boards will be satisfied by an officer of any minority race—not necessarily black.

■ Defendant argues that the "should" and "also desired" is "plainly permissive,"[5] while plaintiff points out that "should" is a past tense of "shall." While "shall" denotes a mandatory action when used in statutes and contracts, "should" does not ordinarily express such certainty.[6] By examining the context in which "should" is used within the policy statements, this Court concludes that it is not used in a

mandatory manner. In setting out the requirements of board membership at that time, the Navy consistently used "will" or "must." The subsection addressing minority officers was the only one in this memorandum that used "should," instead of "will" or "must."

This conclusion is bolstered further by a subsequent pronouncement by the Navy. In the Bureau of Naval Personnel Instruction 1401.1 (BUPERSINST) of September 24, 1982, the Navy addressed minority membership on selection boards in greater detail. Although this instruction was not in effect during 1977–79, it does shed light on the requirement of minority membership. In BUPERSINST 1401.1(6) entitled "Minority Membership on Selection Boards," it provides in pertinent part:

It is recognized that participation of racial and ethnic minorities is beneficial to the selection process. Accordingly, it is important that a member of a minority/ethnic group, when available and qualified, have voting membership on all statutory officer promotion ... boards.... The directed necessity for minority participation on selection boards is not regulatory. A selection board lacking minority membership continues to have competency to perform the duties directed in the precept appointing the board.

■ Although the Court concludes that the policy concerning minority representation on selection boards was not mandatory, it does not mean that the Navy could choose to ignore it. This, however, is not the case. There were no active or retired, Regular or Reserve, Medical Corps officers serving in the rank of rear admiral and above who were members of a recognized minority. Since all of the voting members of a selection board had to be senior in rank to those being considered for promotion to rear admiral, and there were no blacks or other minorities available in the

---

5. Defendant's Proposed Findings of Fact & Conclusions of Law at 4.

6. *Black's Law Dictionary* states that "shall" is "generally imperative or mandatory." "Shall" also "[excludes] the idea of discretion." *Black's*

*Law Dictionary* 1233 (5th ed. 1979). On the other hand, Black's states that "should" implies duty or obligation, "although usually no more than an obligation of propriety or expediency, or a moral obligation." *Id.* at 1237.

Regular or Reserve Medical Corps, there is no evidence that the Navy deliberately excluded such officers from the selection boards.

Plaintiff claims that qualified flag officers could have been pulled from other staff corps. Defendant argues that such action would have contravened the long-standing Navy policy and practice of limiting staff corps promotion board membership to officers from the same staff corps as the candidates for promotion.

Staff corps promotion boards have been traditionally composed of officers who are members of the same staff corps. *See* Plaintiff's Trial Exhibit 2 at 2. In this manner, doctors consider doctors, judge advocates consider judge advocates and so on. The logic is apparent. Those in the same profession are more qualified to evaluate others in their profession. It is neither likely that a doctor would know how to evaluate a chaplain, nor vice versa.

Having the promotion board consist of officers who will be selecting officers in their own staff corps is mirrored in United States Navy Regulation 0842 (1973, Revised June 7, 1979): "An officer in a staff corps shall be detailed to command only such activities as are appropriate to his corps." If doctors command doctors, then only doctors should select doctors for promotion. This practice was reaffirmed in 1982 in BUPERSINST 1401.1(4)(b)(3): "The membership of boards convened to consider officers of the various staff corps for promotion, to the maximum extent practicable, normally will consist of ... [officers] in the same competitive category as those under consideration."

After concluding that minority representation on selection boards was not a mandatory requirement under Navy regulations, this Court cannot conclude that the Navy was required to include a non-Medical Corps rear admiral on plaintiff's selection boards based solely on his or her color. To require the Navy to artificially include a black rear admiral of another staff corps on the selection board for the purpose of determining plaintiff's fitness for promotion as a Doctor of Medicine would interfere with the military's exercise of discretion over internal management decisions. *Orloff v. Willoughby,* 345 U.S. 83, 93–94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953). This deference is "at its highest when the military, pursuant to its own regulations effects personnel changes through the promotion or discharge process." *Dilley v. Alexander,* 603 F.2d 914, 920 (D.C.Cir. 1979), *clarified,* 627 F.2d 407 (D.C.Cir. 1980).

There is no evidence that the Navy excluded any eligible blacks from the selection boards. Lieutenant Kenneth L. Epps, a black in the Regular Navy, served as the Assistant Recorder for the 1979 fiscal year selection board. Although Recorders and Assistant Recorders are not voting members, their selection shows an attempt by the Navy to have minorities serve on selection boards when it is possible. With no black rear admirals at all in the Medical Corps, the Navy was hard pressed to provide them on selection boards.

■ The Court concludes that minority representation on selection boards was not a mandatory requirement under Navy regulations and that the Navy was not required, under its regulations, to include a non-Medical Corps rear admiral on plaintiff's selection boards in order to provide minority membership.

**B. Equal Protection Claim**

Plaintiff believes that the absence of blacks on his selection boards caused his nonselection and that he was not selected because he is black. He claims that he would have been promoted if a black had been on the selection boards.

■ The due process clause of the fifth amendment contains an equal protection component which prohibits the United States from invidiously discriminating between individuals or groups. *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). "Proof of racially discriminatory intent or purpose is required to show a violation of the [e]qual [p]rotection [c]lause." *Village of Arlington Heights v. Metropolitan Housing Dev.*

*Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). Thus, to prevail under his equal protection claim, plaintiff must prove the selection boards acted with discriminatory purpose.

Plaintiff asks the Court to consider the absence of blacks in the rank of rear admiral in the Medical Corps as prima facie evidence that the Navy discriminates against blacks. Although the Court finds this fact abominable, it alone is not enough. "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution." *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976).

Other kinds of evidence, however, may be used to prove discriminatory intent. In *Arlington Heights*, the Supreme Court mentioned several sources of evidence that may be helpful when determining whether a discriminatory purpose was a motivating factor. *Arlington Heights*, 429 U.S. at 267–68, 97 S.Ct. at 564–65. The Court suggested that the "specific sequence of events" leading up to the challenged decision could show a discriminatory purpose. Also, "[d]epartures from the normal procedural sequence" and "[s]ubstantive departures too may be relevant," especially where the factors usually considered important by the decisionmakers are ignored. *Id.* at 267, 97 S.Ct. at 564.

■ Plaintiff has not shown a specific sequence of events leading up to the promotion decisions that would show a discriminatory purpose. Although there were no blacks on the selection boards, it has already been shown that there were no black rear admiral doctors available to sit on the boards. Plaintiff presented no evidence that would show any acts of discrimination toward him. He was promoted through the ranks in the normal sequence to attain the rank of captain in July of 1972. He was not eligible for promotion to rear admiral until the January 1977 selection board, when he was considered for promotion for the first time. No officer junior to plaintiff was selected over him during this time and there is no evidence

that the officers promoted were less qualified than plaintiff. (See discussion below.)

Plaintiff claims that he was as qualified or more qualified than those actually selected and that the Navy failed to select him "primarily because of race." *See* Complaint at 2. This Court is not a super selection board and cannot "second [guess] the appropriate military officials whose job it is to decide these military personnel promotion matters." *Braddock v. United States*, 9 Cl.Ct. 463, 474 (1986). It is apparent, however, that all of the rear admiral selectees were amply qualified.

To begin, there are only seven rear admiral slots in the Medical Corps of the Naval Reserve. 10 U.S.C. § 5457 (1982). The probability of making the grade of rear admiral is slim when one considers the number of officers eligible to be promoted to that rank and the limited slots available.

In January of 1978, 116 officers were eligible for promotion and two officers were selected. Captain Willis was above the zone at number 12 on the lineal list and Captain Senior was below the zone at number 62. Plaintiff was below the zone at number 90. Neither officer selected was junior to plaintiff. Both have outstanding records.

Captain Willis was the Director of Cardiology at the University of Michigan Medical Center and a member of multiple medical committees. He was a consultant-lecturer at the National Naval Medical Center in Bethesda, Maryland; was an editorial consultant for the American Journal of Cardiology from 1978–80; and was on the editorial board of the *Cardiology Digest*. He received numerous medals and awards while in the Navy. His inactive Naval Reserve affiliations included: Commanding Officer of the Naval Reserve Medical Company 9–34 in Ann Arbor, Michigan; Senior Medical Officer of the Naval Reserve Support Unit 9–18 in Southfield, Michigan; and Chief of the Naval Reserve Support Unit in Southfield, Michigan. Captain Willis was a captain for over ten years before he was promoted to the rank of rear admiral.

While serving in the rank of captain from July 1967 until his promotion in September

of 1977, Captain Willis received outstanding marks in his fitness reports. He received an overwhelming number of recommendations for early promotion, many with exceptionally high marks, and several recommendations for promotion to flag rank. All of his fitness reports were favorable, praising his service and contributions to the Navy.

Captain Senior was a Professor of Clinical Medicine at the University of Pennsylvania and Director of a Special Treatment Unit for Alcohol Related Disorders. He was a member of several medical committees, a consultant for the National Board of Medical Examiners, and the author of over 46 publications, 37 abstracts, and 2 books. He received several medals while in the Reserve, and was a lecturer-consultant in gastroenterology, liver diseases and alcohol related disorders at the Naval Regional Medical Center in Philadelphia, Pennsylvania. His inactive Naval Reserve affiliations included: Commanding Officer of the Naval Reserve Medical Company 4-3 in Philadelphia, Pennsylvania; Commanding Officer of the 2nd Marine Division Medical Headquarters 104 in West Trenton, New Jersey; and Chief of the Naval Reserve Unit in Philadelphia, Pennsylvania. Captain Senior was a captain for over six years before he was promoted to the rank of rear admiral.

While serving in the rank of captain from May 1971 until his promotion in September of 1977, Captain Senior received outstanding marks in his fitness reports. He received a large number of recommendations for early promotion and the overwhelming majority of the remainder of reports gave Captain Senior extremely high marks. He was commended for all of his contributions in the medical field, including his large number of publications and participation on medical committees.

It is clear to this Court that both of these officers were highly qualified and extremely competent in their chosen profession. There is no evidence that they were less qualified than plaintiff when they were selected for promotion to the rank of rear admiral.

In January of 1979, 119 officers were eligible for promotion and one officer was selected. Captain Edmondson was below the zone at number 55 on the lineal list, while plaintiff was also below the zone at number 69. Captain Edmondson was not junior to plaintiff and he has an excellent record.

Captain Edmondson was the Chief of Surgery of the Veterans Administration Hospital in Augusta, Georgia, and was a professor of surgery at the Medical College of Georgia, also in Augusta. He was a member of numerous medical associations and societies and the author or co-author of various articles published in medical journals. He received several medals while in the Reserve. His inactive Naval Reserve affiliations included: service as medical officer from 1962–1975; Division Surgeon of the 4th Marine Division in Camp Pendleton, California; and Division Surgeon of the 4th Marine Amphibious Force in New Orleans, Louisiana. He also has an impressive list of active duty service for training in the grade of captain from September 1972 until March 1978. Captain Edmondson was a captain for over seven years before he was promoted to the rank of rear admiral.

While serving in the rank of captain from July 1972 until his promotion in June 1979, Captain Edmondson received outstanding marks in his fitness reports. He received a solid number of recommendations for early promotion and an overwhelming number of reports with high marks, including recommendations for promotion to flag rank. All of his fitness reports were highly complimentary, praising his service in the Navy.

In October of 1979, 151 officers were eligible for promotion and one officer was selected. Captain Miller was below the zone at number 49, while plaintiff was also below the zone at number 55. Captain Miller was not junior to plaintiff and has an admirable record.

Captain Miller was the Commander of the Naval Support Activity in Da Nang, Republic of Vietnam from June 1969 until September 1969. He received several service medals and a Navy Commendation Medal. His inactive Naval Reserve affil-

iations included: Commanding Officer of the Naval Regional Medical Center 3123 in Millington, Tennessee; Commander of the Naval Reserve Readiness Command, Region Nine in Memphis, Tennessee; Medical Officer for Fleet Command Staff 823 in Memphis, Tennessee; and the Liaison Officer for the University of Tennessee's College of Medicine. While serving in active duty for training in the grade of captain, he was Chairman of the National Committee for Employer Support of the Guard and Reserve in Arlington, Virginia in December 1972; Regional Chairman for the National Committee for Employer Support of the Guard and Reserve in New Orleans, Louisiana in February 1974; and Chairman of the Medical Reserve Conference Sea Lodge in La Jolla, California in September 1976. Captain Miller was a captain for over seven years before he was promoted to the rank of rear admiral.

While serving in the rank of captain from July 1972 until his promotion in September 1979, Captain Miller received outstanding marks in his fitness reports. He received an overwhelming number of recommendations for early promotion and a large number of reports finding him "not exceeded" in every category. His contributions to neurosurgery were highly commended, as were his contributions to the Navy.

Plaintiff's record, while impressive, does not support his claim that he was more qualified than the others. Plaintiff served as the Area Coordinator for the Naval Academy's Blue and Gold Program. Captain Skillman testified at trial that service as a Blue and Gold officer would give an officer "extra credit." He also stated that good performance is normal, but bad performance is uncommon.

Plaintiff also served on the Recruiting District Advisory Committee, established a Naval Junior ROTC Unit at the Wilmer–Hutchins High School in the North Texas area and served on the Naval Academy selection committees of two congressmen from the Dallas area. He founded the National Naval Officers Association in 1972, a minority group with goals of increasing community participation with the Navy, and served as Medical School Liaison Officer to Meharry Medical College in Nashville, Tennessee.

While plaintiff had complimentary fitness reports, they were not overwhelmingly superior to those of the selected officers. Plaintiff was recommended at least six times for early promotion and received numerous "excellent" and "outstanding" remarks. He was highly recommended as to his contributions to the Blue and Gold Program. This Naval Academy Information Program is "dedicated to the identification, recruitment and counseling of young men of exceptional potential to prepare for careers in the Navy and Marine Corps through the U.S. Naval Academy." Several fitness reports also credited plaintiff for doubling the number of minority midshipmen during his time of service. Careful scrutiny of plaintiff's fitness reports shows that plaintiff was well-liked, received favorable comments, and obtained complimentary recommendations. The Court finds no evidence of discriminatory bias against him in any of his fitness reports.

Plaintiff is to be commended for his service and dedication in the Reserve, but the Court is not able to find that his record surpassed those selected. There is no evidence that he was not selected for promotion due to his race. All of the officers promoted had outstanding service records, were leaders in their respective fields of medicine, and contributed heavily in both their civilian and naval activities.

The absence of any black rear admirals in the Medical Corps may be prima facie evidence that there has been discrimination in the past, but the Court believes that the Navy has rebutted this evidence, as to plaintiff, by showing that only Medical Corps officers should sit on these selection boards to select other Medical Corps officers. Plaintiff was not able to carry his burden at trial. He was his only witness and did not put on any evidence from any other sources from within the Navy or otherwise.

Plaintiff also stated in his papers that he "need not go into the long history of racial discrimination in the United States Navy"

because it "is history known to all who would take the time to review it." *See* Plaintiff's Request to Deny Defendant's Second Motion for Dismissal or, in the Alternative for Summary Judgment at 2. Unfortunately, plaintiff does need to go into this. He failed to offer any statistical evidence of invidious discrimination, with the exception of there being no black rear admirals in the Medical Corps.

Plaintiff has not shown any departures from normal procedures. Other than the absence of blacks on the selection boards that considered plaintiff, the normal procedures were followed. The selection board precepts stress equal treatment and opportunity without regard to race, creed, color, sex or national origin.[7] It has already been shown that minority representation on the selection boards was highly desirable, but not mandatory.

There is a strong presumption that the selection board members faithfully discharged their duties. *Neal v. Secretary of the Navy,* 639 F.2d 1029, 1037 (3d Cir.1981). Plaintiff has failed to offer any evidence to rebut this presumption. There is simply no evidence that the selection boards acted with discriminatory purpose toward plaintiff. Plaintiff has also failed to show that the selection boards acted in an arbitrary and capricious manner. All of the evidence supports defendant's claim that the boards performed their duties properly.

There are only seven rear admiral slots in the Medical Corps of the Naval Reserve. Selection for these slots is highly competitive. In January of 1978, two officers were selected out of 116. In January of 1979, only one officer was selected out of 119 and in October of 1979, only one officer was selected out of 151. All officers selected were exceptionally well qualified. Each officer had served as a captain for over ten, six, seven and seven years, respectively, before promotion to the rank of rear admiral. Plaintiff initially claimed he should have been promoted after only two years as captain. It has been shown that he was not even eligible for promotion until 1977, after serving almost five years as captain. Plaintiff was never in the primary zone for selection when he was considered and would not have been in that zone until 1980, subsequent to his voluntary retirement. As such, he never "failed of selection," and was not penalized for nonselection. He was, at all times, "below the zone." The Court concludes that there was no violation of plaintiff's fifth amendment right to equal protection.

## C. Missing Fitness Reports

Not until the close of the pleadings did plaintiff claim that the absence of several fitness reports denied proper consideration of his record. *See* Proposed Findings of Fact & Conclusions of Law; *see also* Closing Argument of Plaintiff at Trial, October 20, 1988. As defendant points out, this is the first time in this case that plaintiff has made a due process argument as to the missing fitness reports.

Defendant was not given a fair opportunity to respond to this issue. This is a new theory of recovery not included in the original complaint and plaintiff failed to raise it until trial. Basic principles of due process and the orderly conduct of litigation protect litigants from the unenviable task of defending against arguments advanced in this belated fashion. *See Conair v. NLRB,* 721 F.2d 1355, 1372 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 819 (1984).

In addition, Captain Skillman testified at trial that it was common for fitness reports

---

7. Paragraph 9 of the precepts convening the selection boards states:

> Equality of treatment and opportunity has long been the official policy of the Department of the Navy. The policy of equal opportunity in the naval service applies without regard to race, creed, color, sex or national origin. In your deliberations, you will apply this policy. Upon receipt of your recommendations, I intend to examine with particular care the extent to which this requirement has been complied with.

In addition, the members of the selection boards must take an oath that they "will, without prejudice or partiality and having in view both the special fitness of officers and the efficiency of the naval service, perform the duties imposed upon you as a member of this board...." *See* paragraph 12 of the precepts.

to be missing, especially as to inactive Reserve officers. The nine missing reports ranged from September 1950 until October 1976, with only three missing during his seven years as captain. The Court observed that all of the service records of those officers selected for promotion were also missing numerous fitness reports.

The Court declines to rule on an issue raised only after the close of pleadings, with no specific evidence offered by plaintiff.

### III. *Conclusion*

After carefully reviewing all of the facts and the evidence in this case, the Court concludes that defendant did not violate any of plaintiff's constitutionally guaranteed rights through the promotion and selection process of the Naval Reserve. Plaintiff failed to show that any of the selection boards acted with any discriminatory purpose toward him. Plaintiff's service record does not support his proposition that he surpassed all of the officers actually selected. While plaintiff had an impressive record, it by no means guaranteed him a promotion to the rank of rear admiral when other officers had exceptional records.

The Court does admonish defendant that it finds the lack of minorities in the rank of rear admiral astonishing. The Court encourages defendant to examine carefully its selection process to determine how it might improve this representation. For the reasons stated above, the Court finds in favor of defendant. An appropriate order is attached.

### ORDER

Upon consideration of the trial held to the Court on October 19–20, 1988, and the entire record herein, it is by the Court this 22nd day of March 1989,

ORDERED that the United States Naval Reserve Medical Corps selection boards that met in January 1978, 1979, and October 1979 were composed properly. Minority representation on these selection boards was not a mandatory requirement under Navy regulations and the Navy was not required, under its regulations, to include a non-Medical Corps rear admiral on plaintiff Dr. Emerson Emory's selection boards in order to provide minority membership; it is further

ORDERED that there was no violation of plaintiff's fifth amendment right to equal protection when the Naval Reserve Medical Corps selection boards failed to promote him to the rank of rear admiral in January 1978, 1979, and October 1979; it is further

ORDERED that each party bear its own costs in this action; and it is further

ORDERED that this case is dismissed.