**Robert H. ADAIR et al., Plaintiffs,**

v.

**Gordon R. ENGLAND, Secretary of the Navy, et al., Defendants.**

**Chaplaincy of Full Gospel Churches et al., Plaintiffs,**

v.

**Gordon R. England, Secretary of the Navy, et al., Defendants.**

**Civil Action Nos. 00–0566 (RMU), 99–2945 (RMU).**

United States District Court, District of Columbia.

Jan. 10, 2002.

Arthur A. Schulcz, Sr., Vienna, VA, for all plaintiffs and Chaplaincy of Full Gospel Churches.

Thomas E. Caballero, U.S. Department of Justice, Civil Division, Washington, DC, for defendants.

## MEMORANDUM OPINION

DENYING IN PART AND GRANTING IN PART THE DEFENDANTS' MOTION TO DISMISS; DENYING AS MOOT THE DEFENDANTS' MOTION TO HOLD THE PROCEEDINGS IN ABEYANCE; DENYING WITHOUT PREJUDICE THE PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT; DENYING WITHOUT PREJUDICE THE PLAINTIFFS' MOTION TO ALLOW A CHAPLAIN PLAINTIFF TO USE A PSEUDONYM

URBINA, District Judge.

## I. INTRODUCTION

These cases incite a probing scrutiny of the First Amendment's Establishment and Free Exercise Clauses. While the vast majority of First Amendment religion cases involve laws or governmental policies that allegedly promote or inhibit religion in relation to the secular realm (e.g., school-voucher cases, prayer-in-school cases), the instant cases implicate the more unusual claim that governmental policies favor one religion over another.

Although the above-captioned cases are not consolidated for all purposes, they have been consolidated for purposes of the pending motions.[1] In the *Chaplaincy* case, the plaintiffs are an endorsing agen-

1. In January 2001, the court's Calendar Committee transferred both of these cases from Judge June Green to this member of the court. In an order dated September 26, 2000, Judge Green accepted the parties' joint recommendation and consolidated the two cases for purposes of the pending motions. *See* Order dated September 26, 2000. The parties agree that their briefs on the *Adair* case control and that the court should apply its rulings on the *Adair* motions to the *Chaplaincy* case as well. *See* Stipulation dated September 25, 2000.

cy for military chaplains and seven of its individual members. In the *Adair* case, the plaintiffs are 17 current and former non-liturgical chaplains in the Department of the Navy ("the defendants", "Navy", or "DON"). In both cases, the plaintiffs allege that the Navy has established and maintained an unconstitutional religious quota system for promotion, assignments, and retention of Navy chaplains, in violation of both the Establishment Clause and the Free Exercise Clause of the First Amendment, and the Equal Protection Clause of the Fifth Amendment. Specifically, the plaintiffs allege that the Navy's policies and practices favor liturgical Christian chaplains over non-liturgical Christian chaplains.

The principal motion before the court is the defendants' motion to dismiss the complaint in the *Adair* case. For the reasons that follow, the court will deny in part and grant in part the defendants' motion to dismiss. In addition, because the court declines to convert the defendants' motion to dismiss into a motion for summary judgment, the court will deny without prejudice the plaintiffs' motion for partial summary judgment and will order a briefing schedule on the plaintiffs' motion.

Moreover, because the court will now resolve the defendants' motion to dismiss, the court will deny as moot the defendants' motion to hold in abeyance the proceedings on the plaintiffs' motion for partial summary judgment until the court resolves the defendants' motion to dismiss. Lastly, the plaintiffs filed a motion to allow one chaplain plaintiff, who feared harassment and retaliation, to use a pseudonym to pursue this litigation. Because the plain-

tiffs filed a motion for class certification, which would render the motion for a pseudonym moot, the court will deny without prejudice the plaintiffs' motion to allow one plaintiff to use a pseudonym and will revisit the issue, if necessary, after the court has ruled on the plaintiffs' motion for class certification.

## II. BACKGROUND

### A. Factual History [2]

#### 1. The Navy Chaplain Corps

Congress provided for the organization of the Navy Chaplain Corps, whose members are commissioned Naval officers who possess specialized education, training, and experience "to meet the spiritual needs of those who serve in the Navy and their families." *See Adair* First Am. Compl. ("Compl.") at 21; *see also* Mot. to Dismiss at 4 (citing 10 U.S.C. § 5142); *Katcoff v. Marsh,* 755 F.2d 223 (2d Cir.1985) (rejecting Establishment Clause challenge to Army chaplaincy program since such program was necessary to protect Army personnel's free-exercise rights).

To comply with this congressional directive, the Department of Defense ("DoD") established a system to recruit professionally qualified chaplains for service in the Armed Forces "to provide for the free exercise of religion for all members of the Military Services, their dependents, and other authorized persons." *See* Mot. to Dismiss at 4 (quoting 32 C.F.R. § 65.2). The defendants explain that chaplains serve as Naval officers and, when seeking promotions, pursue the stan-

---

**2.** For purposes of the instant motion to dismiss, the court must accept all the complaint's well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90

(1974), *overturned on other grounds by Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Indeed, the defendants acknowledge this point in their motion to dismiss. *See* Mot. to Dismiss at 4 n. 1.

dard course for advancement through promotion to higher grades. *See id.* (citing 10 U.S.C. § 5142). Like other military officers, chaplains receive periodic reviews by promotion boards to determine which chaplains should be recommended for promotion. *See id.* (citing 10 U.S.C. §§ 611 and 5142). The promotion boards are composed of five or more members, at least one of whom must be from the category under review. *See id.* at 4–5 (citing 10 U.S.C. § 612). Until recently, the Navy's chaplain promotion boards have generally included one line officer and four Chaplain Corps officers.[3] *See id.* at 5.

## 2. Definitions

The Navy divides most of its Christian personnel into three general categories: Catholic, liturgical Protestant, and non-liturgical Christian. *See* Compl. at 21. The plaintiffs are all non-liturgical Christians. The Navy uses the term "special worship" to denote a small number of Christian and non-Christian faith groups that have unique or special needs for their worship and religious practices, including Jewish, Seventh–Day Adventist, Christian Science, Latter–Day Saints (Mormons), Muslim, Hindu, and other religions. *See id.* at 21 n. 3.

The term "liturgical Protestant" refers to those Christian Protestant denominations whose services include a set liturgy or order of worship. *See* Compl. at 21. According to the plaintiffs, "[t]his primarily includes those Protestant traditions or denominations that began during the Protestant Reformation and who retained an established liturgy in their worship services such as Lutheran, Reformed and Episcopal denominations, and the denominations which later evolved from them,

e.g., Presbyterian and Methodist." *Id.* at 21–22. The plaintiffs explain that while every church "has some 'order' to its worship," these Protestant denominations do not have a worship service without the prescribed liturgy. *See id.* at 22 n. 4. Another common feature of these liturgical denominations is that they all practice infant baptism. *See id.* at 22. Also known as "high church" or "main line churches," "liturgical Protestant" is used by the plaintiffs to refer to chaplains of the Lutheran, Episcopal, Methodist, Methodist Episcopal, United Church of Christ, Congregational, Reformed and Presbyterian denominations, and the Orthodox tradition.[4] *See id.*

In contrast, "non-liturgical" denotes Christian denominations or faith groups that do not have a formal liturgy or order in their worship service. *See* Compl. at 22. According to the plaintiffs, these groups baptize only adults or children who have reached "the age of reason" and their clergy do not usually wear vestments or special religious dress during services. *See id.* Referred to by some Navy chaplains as "low church," the non-liturgical Christian categories include Baptist, Evangelical, Pentecostal, and Charismatic faith groups. *See id.* The Navy often refers to these faith groups as "non-liturgical Protestant." *See id.* The plaintiffs belong to this category and represent Southern Baptist, Christian Church, Pentecostal, and other non-liturgical Christian faith groups. *See id.*

## 3. Parties

In the *Adair* case, 17 current and former non-liturgical Christian chaplains filed

---

3. By line community, the parties refer to the operational service members as opposed to service members from the professional communities or the Chaplain Corps.

4. The defendants employ the same terminology as the plaintiffs for the sake of clarity. *See* Mot. to Dismiss at 5 n. 5.

suit.[5] The plaintiffs sue on their own behalf and, as a proposed class, on behalf of similarly situated chaplains.[6] The lawsuit challenges religious discrimination in the Navy Chaplain Corps ("the Chaplain Corps" or "the Corps"), "including the establishment of illegal religious quotas for Navy chaplain promotions and career opportunities; the establishment of a preferred religious tradition and a religious patronage system in the Corps; and creation of a pervasive climate of bias, animosity and deceit toward non-liturgical Christian Navy chaplains . . . ." Compl. at 4. In addition, the plaintiffs plead violations of the First and Fifth Amendments in the Corps' promotion, retention, and separation decisions. *See id.*

A sampling of the individual plaintiffs' allegations is as follows.

Plaintiff Robert Adair enlisted in the Navy in January 1967. *See id.* at 5. After completing his enlistment in 1970, he attended college and then earned a Master of Divinity degree in 1977. *See id.* The Southern Baptist convention, a non-liturgical Christian denomination, endorsed him and he became an active-duty Navy chaplain in 1979. "Despite his outstanding service, he was selected for early retirement in [Fiscal Year 1995] by a Selective Early Retirement Board (SERB) that selected only non-liturgical Christian chaplains while allowing liturgical chaplains with inferior records to continue on active duty." *Id.* Plaintiff Adair charges that he involuntarily retired in 1996. He alleges that, "[b]ut for the SERB decision, believed to rest on illegal religious discrimination and

animosity toward his faith group, [plaintiff] Adair would have continued on active duty and retired at a higher pay rate." *Id.*

Lieutenant Michael Belt, an active-duty chaplain since 1991, alleges that a liturgical Protestant chaplain berated him for preaching that "men who call themselves Christians should live as Christians." *See* Compl. at 5. This liturgical Protestant chaplain allegedly gave Lieutenant Belt a low mark on his fitness report because he made this statement. *See id.* After Lieutenant Belt and another non-liturgical chaplain reformatted a Protestant worship service with low attendance, the congregation supposedly grew from 40 to about 130. *See id.* The liturgical Protestant chaplain who rated him, however, allegedly told him that his style of worship was "hogwash" and took over the service, returning it to a liturgical service. *See id.*

Dr. Gregory De Marco served as an enlisted Navy "hard hat" deep-sea diver from 1972 to 1981, at which point he left the Navy to attend a seminary. *See* Compl. at 6. In 1983, he was commissioned as a non-liturgical Christian chaplain and remained in the U.S. Naval Reserves until he was recalled to active duty in 1987. *See id.* The Navy promoted him to lieutenant commander in 1993 and he remained on active duty until 1998. *See id.* In December 1997, the liturgical command chaplain allegedly criticized plaintiff De Marco for ending his prayers "in Jesus [sic] name." *See id.* When plaintiff De Marco "insisted on praying in accordance with his beliefs and religious tradition," the liturgical com-

---

5. The 17 plaintiffs are: Robert H. Adair, Michael Belt, Dr. Gregory R. De Marco, Furniss Harkness, Michael Lavelle, George W. Linzey, Timothy D. Nall, Thomas Rush, James M. Weibling, Michael A. Wright, John Witherspoon (pseudonym), William C. Blair, Larry Farrell, Rafael J. Quiles, Lyle Swanson, Ronald Tomlin, and David S. Wilder.

6. The court has ordered the parties to brief the issue about whether the *Adair* plaintiffs may proceed as a class and does not decide that issue for purposes of this decision. *See* Order dated September 28, 2001.

mand chaplain allegedly rated him in a manner that made him noncompetitive for promotion. *See id.* The plaintiff claims that this rating was based on "faith group prejudice and bias." *See id.* Because he allegedly suffered such significant hostility and prejudice, he decided to retire early to "save further humiliation, minimize his personal and professional injury, and minimize the disruption and damage to his family." *Id.* at 7. In effect, Dr. De Marco claims that the Navy's actions constituted a constructive discharge from his job based on religious prejudice. *See id.*

Another plaintiff, Furniss Harkness, asserts that the Navy denied him a promotion in retaliation for his successful challenge of a Navy policy to the Navy's Inspector General several years earlier. *See* Compl. at 7–8. Other named plaintiffs claim that the Navy discriminated against non-liturgical Christian chaplains by selecting them in very large proportion for early retirement. In addition, instead of being selected for early retirement by the SERB, they were allegedly personally preselected by the Chief of Chaplains. *See id.* at 9.

The plaintiffs also claim that the Navy exhibited a systematic pattern of prejudice against non-liturgical Christian chaplains with prior military service. *See id.* at 11. "[T]he motivation behind this prejudice is the liturgical hierarchy's fear that a non-liturgical chaplain's prior military service gives him a competitive edge against other liturgical chaplains." *Id.* According to the plaintiffs, prior service can give a chaplain a greater understanding of how the Navy works and can provide an instant rapport with the sailors and Marines, resulting in

more effective ministry and thus better fitness reports. *See id.* "In an equitable promotion system, some of these prior service chaplains would rise to the top of the Chaplain Corps, posing a threat to liturgical domination and control." *Id.* at 11–12.

Plaintiff James Wiebling states that he would have brought his claim against the Navy sooner, but the defendants deliberately and fraudulently concealed information from him. *See* Compl. at 12–13. He became aware of this supposed pattern of prejudice "only in late 1999 when ... he learned of the Stafford Report and its implications."[7] *Id.* at 12. He and several other named plaintiffs therefore ask for an equitable tolling of the statute of limitations. *See id.* at 13 and n. 2.

The defendants in the *Adair* case, all sued in their official capacities, are Gordon R. England, Secretary of the Navy, Vice Admiral Norbert R. Ryan, Chief of Naval Personnel, Rear Admiral Byron Holderby, Jr., Chief of Chaplains, Rear Admiral Barry Black, Deputy Chief of Chaplains, and the United States Navy. *See* Compl. at 3.

## B. Procedural History

In the companion case, *Chaplaincy of Full Gospel Churches v. England,* Dkt. No. 99cv2945, the plaintiffs filed their complaint on November 5, 1999. On January 10, 2000, the plaintiffs filed an amended complaint. Chaplaincy of Full Gospel Churches ("CFGC") is an ecclesiastical endorsing agency that certifies non-liturgical Christian clergy for service in the military.[8] *See Chaplaincy* First Am. Compl. at 1, 3. The DoD has approved CFGC as an endorsing agency since 1984. *See* Dkt. No. 99cv2945, Mem. Op. dated August 17,

---

7. The court discusses the "Stafford Report" in Section II.C.2 *infra.*

8. The *Chaplaincy* defendants are Gordon R. England, Secretary of the Navy, Vice Admiral

Norbert R. Ryan, Chief of Naval Personnel, and the United States Navy. *See Chaplaincy* First Am. Compl. at 1.

2000 at 4 (Green, J.).[9] CFGC brought suit on behalf of itself and several of its chaplains, seeking both remedial and prospective relief. On February 2, 2000, the plaintiffs filed a motion for a temporary restraining order and a preliminary injunction, which the court denied. *See* Mem. Op. dated February 15, 2000 (Green, J.).

Meanwhile, on February 1, 2000, the defendants filed a motion to dismiss the amended complaint. On February 22, 2000, the plaintiffs filed a motion for leave to file a second amended complaint. The parties fully briefed these two motions. Then, on June 23, 2000, the plaintiffs filed a motion for partial summary judgment. The defendant responded to this motion with a motion to hold in abeyance the proceedings on the plaintiffs' joint motion for partial summary judgment until the court resolved the defendants' motion to dismiss.

On August 17, 2000, the court issued a Memorandum Opinion, granting in part and denying in part the defendants' motion to dismiss for lack of standing pursuant to Federal Rule of Civil Procedure 12(b)(1). *See* Mem. Op. dated August 17, 2000 (Green, J.). The court held that while CFGC had standing to sue on behalf of its chaplains, it lacked standing to sue on its own behalf. *See id.* Moreover, the court concluded that the plaintiffs could seek only prospective, and not remedial, relief. *See id.* The court also granted the plaintiffs' motion to file a second amended complaint. *See id.*

In the *Adair* case, the plaintiffs filed their class-action complaint on March 17, 2000. On June 16, 2000, the defendants filed a motion to dismiss. As they did in the companion case, the plaintiffs filed a motion for partial summary judgment on June 23, 2000, and the defendants again responded by filing a motion to hold in abeyance the proceedings on the plaintiffs' motion for partial summary judgment until the court had resolved the defendants' motion to dismiss.[10]

On September 5, 2000, the *Adair* plaintiffs filed a motion to amend their complaint, seeking to add six more plaintiffs, one additional Navy defendant, and three additional counts. *See* Compl. at 3. On September 22, 2000, the defendants filed a motion to dismiss the amended complaint. In addition, the parties jointly proposed that their briefing on the defendants' motion to dismiss the original complaint be incorporated as the briefing for the defendants' motion to dismiss the amended complaint. Judge Green agreed, and consolidated the *Adair* and *Chaplaincy* cases for purposes of resolving the preliminary motions and ordered that the briefing on the defendants' motion to dismiss in the *Adair* case would control.[11] *See* Order dated September 26, 2000 (Green, J.). Lastly, on October 21, 2000, the *Adair* plaintiffs filed a motion to allow a chaplain plaintiff to use a pseudonym in order to pursue this litigation.

---

9. For a more detailed discussion of the factual background of the *Chaplaincy* case, see Judge Green's August 17, 2000 Memorandum Opinion at 2–7.

10. In addition, the plaintiffs filed a separate motion for partial summary judgment. In their opposition to the defendants' motion to dismiss, the plaintiffs asked the court to somehow convert the defendants' motion to dismiss into a plaintiffs' motion for partial summary judgment. As discussed below, the court declines to do so at this juncture and has laid out a briefing schedule for both the plaintiffs' motions for summary judgment in its September 28, 2001 order and the order accompanying this Memorandum Opinion.

11. Because the briefs in the *Adair* case control, from this point forward, the court's use of the term "plaintiffs" refers to the *Adair* plaintiffs, unless otherwise noted.

On January 10, 2001, the Calendar Committee of the United States District Court for the District of Columbia randomly reassigned these two cases to this member of the court. Accordingly, the motions now pending before the court are as follows: (1) the defendants' motion to dismiss; (2) the defendants' motion to hold in abeyance the proceedings on the plaintiffs' motion for partial summary judgment until the court resolves the defendants' motion to dismiss; (3) the plaintiffs' motion for partial summary judgment; and (4) the plaintiffs' motion to allow a chaplain plaintiff to use a pseudonym.

### C. The Plaintiffs' Allegations

The plaintiffs claim that in the late 1960's and 1970's, America's religious demographics began a substantial shift away from liturgical Protestant denominations toward the non-liturgical Christian churches, which the plaintiffs represent. *See* Compl. at 29. "This trend continues today." *Id.*

Until the mid to late 1980's, the Navy—like the Army and the Air Force—used a rough proportional-representation plan to determine how many chaplains it would hire from various religious denominations, according to the plaintiffs.[12] *See id.* at 29. Under this system, the Navy allegedly allocated chaplains among the various faith groups based on objective criteria, such as the relative percentage a religion represented in the total American population, as reported in sources such as the annual *Yearbook of American and Canadian Churches. See id.* For example, if 100 Navy chaplains slots were authorized and Catholics comprised 25 percent of the American religious population and Baptists made up 20 percent, the Navy would try to hire 25 Catholic and 20 Baptist chaplains. *See id.*

Starting in the late 1980's and continuing to the present, however, the Navy—unlike the Army and the Air Force—allegedly switched to a subjective "needs of the service" policy, which, the plaintiffs plead, became the "thirds policy." *See* Compl. at 29. Under the thirds policy, the Navy allegedly reserves one-third of its slots in the Chaplain Corps for liturgical Christians, one-third for Catholics, and one-third for members of every other religion. *See id.* at 29–30. Non-liturgical Christians are included in this last, catchall category, along with all the "Special Worship" groups, such as Jewish, Muslim, Hindu, Buddhist, etc. *See id.* In addition, "one third of Navy chaplain promotions, retentions on active duty and accessions were allegedly reserved for liturgical Protestant chaplains, whereas this group represented less than one eleventh of the religious membership of the Navy." *Id.* at 30.

According to the plaintiffs, top officials in the Chaplain Corps instituted the thirds policy to continue a heavy representation of liturgical Christians in the Corps itself and in the Corps' highest command posts, despite the fact that the percentage of liturgical Christians was declining both in the country and in the Navy. *See id.*

### 1. The Navy's Religious Demographics

The Armed Forces records religious-preference data for its service members. *See* Compl. at 27 Ex. 1 (a July 1998 report by the Defense Manpower Data Center ("DMDC")), Ex. 2 (a February 2000 DMDC report). The plaintiffs charge that the DMDC data demonstrates that liturgical Protestants made up about 8.76 percent of all DON active-duty personnel, i.e., both sailors and Marines, in 1998 and

---

12. The Marine Corps is a subsection of the Navy, which supplies the Marine Corps' chap- lains. *See* 10 U.S.C. § 5061; Compl. at 28 n. 5.

about 8.03 percent in 2000.[13] *See* Compl. at 28 (citing Exs. 1, 2). Specifically, in the 1998 report, service members of the various Methodist named or affiliated denominations comprised about 3.78 percent of all DON personnel, Presbyterian-related denominations comprised about 1.05 percent, the various Lutheran denominations comprised about 2.90 percent, Episcopal and Reformed Episcopal comprised about .73 percent, Methodist Episcopal comprised .20 percent, Reformed comprised about .10 percent, Orthodox .10 percent, for a total of about 8.76 percent. *See id.* (citing Ex. 1). This total had dropped to 8.03 percent in the February 2000 report. *See id.* (citing Ex. 2).

In 1998, Catholics represented 24.09 percent, or 132,429 out of 549,800 DON personnel, and 23.56 percent in 2000. *See id.* (citing Exs. 1, 2). Thus, the plaintiffs point out that Catholics and liturgical Christians combined comprised less than one-third of the Navy's total personnel, with 32.85 percent in 1998 and 31.59 percent in February 2000. *See id.* According to the Navy's alleged thirds policy, however, these groups are receiving two-thirds, or 66.67 percent, of all chaplain slots. *See id.* at 29–30. On the other hand, identified non-liturgical Christian faith groups represent about 50 percent of the Navy's religious population, but the defendants allegedly place the non-liturgical Christians in the catchall group, whereby all other religions combined receive about one-third of the chaplain slots. *See id.* at 28.

## 2. The Specific Counts in the Plaintiffs' Complaint

The allegations set forth in the plaintiffs' 13–count complaint can be grouped into several categories.[14] As an overview, the three principal categories are the plaintiffs' First Amendment Establishment Clause claims, Free Exercise Clause claims, and their Equal Protection Clause claims. Additional claims include allegations that the defendants fraudulently concealed evidence of the plaintiffs' causes of action, that the Navy constructively discharged certain plaintiffs from their work by making the work conditions very difficult, that the Navy abridged the plaintiffs' religious speech in violation of the First Amendment, and that the Navy violated the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*

The court now turns to the allegations in more detail.

First, the plaintiffs charge that the Navy has established and maintained an unconstitutional religious quota system. Specifically, they claim that the Navy's objective in instituting the thirds policy was to create a denominational barrier that allows liturgical Protestant chaplains to maintain control of the Chaplain Corps. *See* Compl. at 29–32. In essence, the non-liturgical Christian chaplains allege that the Navy has devised a system through which it hires, promotes and retains chaplains from liturgical denominations, such as Catholics

---

**13.** The defendants dispute the reliability of this data. For purposes of the defendants' motion to dismiss, however, the court must accept the plaintiffs' well-pled factual allegations as true. *See Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683.

**14.** The plaintiffs actually include 15 counts in their complaint, but Counts 14 and 15 are not separate allegations, but prayers for relief. In these "counts," the plaintiffs merely state that

they seek declaratory relief and a permanent injunction. *See* Compl. at 52–53. The court, therefore, will not treat these items as separate counts. Indeed, since some of the plaintiffs' other 13 counts overlap significantly and do not necessarily even allege separate claims, the court determines that the best approach to take in this Memorandum Opinion is to group the counts by categories of allegations.

and liturgical Protestants, at a rate much greater than the liturgical Christians' representation among all DON personnel. *See* Compl. at 32.

For example, the plaintiffs charge that chaplain promotion boards consistently promote at least the same number of liturgical and non-liturgical Christian chaplains, elevating liturgical Christian chaplains in numbers far greater than the proportionate rate of liturgical Christians in the Navy. *See id.* at 30. They also plead that the promotion boards promote at least one-third liturgical Protestant chaplains in the Corps. *See id.*

As part of this system to maintain significant representation of liturgical Protestants in the Corps, the Navy also allegedly institutes a discriminatory retention policy, whereby it retains liturgical Protestants beyond their initial three-year tour of service at a disproportionately high rate as compared to their total membership percentage in the Navy. *See id.* at 31. According to the plaintiffs, the Navy has also routinely refused to retain non-liturgical Christian chaplains, resulting "in the over-representation of liturgical Protestant chaplains and the under-representation of non-liturgical Christians in the Navy chaplain program." *Id.* In short, the Navy's decisions regarding whether to retain chaplains are allegedly not based on "meeting the religious free exercise needs of Navy personnel, but solely on the basis of the chaplain's religious faith group." *Id.*

The defendants also allegedly promote a disproportionate number of high-church Protestant and Catholic chaplains to the senior officer ranks, i.e., Captain and Admiral, and key billets [15] in the Chaplain Corps. *See* Compl. at 32. Through July 2000, only one non-liturgical person had held the office of Chief of Chaplains since 1917. *See id.* (citing Ex. 3).

The plaintiffs' exhibit 4 is a January 25, 1995 memorandum from the Marine Corps Chaplain, Larry Ellis, to the Navy Chief of Chaplains ("the Ellis Report"). *See id.* at 32–33, Ex. 4. The plaintiffs point to the Ellis Report as documentation for "years of apparent institutional bias against 'low-church' Protestant Navy chaplains in regard to assignments to the most prestigious and influential positions" within the Corps. Compl. at 32–33. As of the time of the report, only 14 clearly identifiable non-liturgical Christian chaplains had filled the 119 top Chaplain Corps positions in the previous 15 years, a fill rate of 11.8 percent. *See* Compl., Ex. 4. On the other hand, the fill rate for liturgical Protestants was 53.8 percent, *see id.*, "far out of proportion to the percentage of the liturgical denominations in the general population of the Navy." *See id.* at 33, Ex. 4. Even after learning of the Ellis Report's findings, the Navy allegedly took no action to address this disparity. *See id.*

According to the plaintiffs, these policies serve no legitimate purpose, are not based on remedying pass discrimination, and are not narrowly tailored. *See* Compl. at 34. "The effect of the Navy's denominational quota system and granting religious preferences to the liturgical Protestant religious tradition, is to impermissibly endorse liturgical Protestant[ism] as an 'official' preferred religious tradition in violation of the First Amendment's Establishment Clause." *Id.*

The next major set of allegations revolves around the defendants' chaplain-promotion system. First, the plaintiffs allege that, unlike the Army and Air Force, which use selection boards comprised of officers from other branches of the armed

---

15. "Billet" is the term the Navy uses for its employment positions. *See* Compl. at 33.

forces to select chaplains for promotion, chaplains dominate the Navy's chaplain selection boards. *See* Compl. at 37. Second, although the boards may consider only merit and not denominational affiliation, each promotion candidate's three-digit "faith group identifier" code is prominently displayed during the promotion process. *See id.* "This procedure has no other purpose than to identify a candidate's faith group to the board and thereby create a suspect religious category unrelated to any legitimate Navy objective." *Id.* Third, the plaintiffs assert that placing more than one chaplain on a chaplain promotion board perpetuates the cycle of illegal religious quotas, unconstitutionally delegates a governmental function to a religious body, and places a candidate's religious affiliation over a candidate's merits. *See id.* at 38–40.

Fourth, the plaintiffs claim that liturgical Protestant and Catholic chaplains have dominated the chaplain promotion boards even though these traditions represent less than a third of the religious preferences of Navy personnel. *See id.* at 38. A rear admiral, the Navy Chief of Chaplains ("the Chief") approves all the members of the Navy's chaplain promotion boards. *See id.* at 37. The plaintiffs charge that the Chief informed one board of his personal list of which chaplains constituted "the future of the Navy." *See id.* at 38. The board allegedly promoted the chaplains the Chief identified, which violates 10 U.S.C. §§ 615 and 616(f)(2), the provisions that define the type of information that may be provided to the board and state that no official may exercise improper influence on the board. *See id.*

To support their allegations, the plaintiffs include a report on chaplain-promotion policies, issued on December 23, 1997 by Captain J.N. Stafford, special assistant for Navy Minority Affairs ("the Stafford Report"). *See* Compl., Ex. 5. The Stafford Report concluded "that the board may have systematically applied a denominational quota system." Compl. at 40. It called for an Inspector General ("IG") investigation into the Chaplain Corps' selection-board processes. *See id.* The Stafford Report also said, "[i]f it is established that improper selection practices have systematically occurred, [then we should] shift responsibility for selection of chaplains for promotion to the line community." Compl., Ex. 5, at 3. In March 1999, a DoD IG investigation into the same boards found that a candidate's faith group "may have been a factor in" the decisionmaking process for the 1998 commander boards in selecting chaplains for promotion. *See id.* at 40 (citing Ex. 6). The investigation also said, however, that there is "little indication of deficiencies in the Navy selection board process." *Id.,* Ex. 6.

The last promotion-related claim focuses on the Navy's use of regional chaplains, by which senior chaplains (primarily liturgical Christians) rate other chaplains rather than having a base commander rate each chaplain on his or her base. *See id.* at 44. Alleging that the system does not ensure religious neutrality, the plaintiffs claim that this arrangement violates the First Amendment. *See id.*

Next, the plaintiffs allege that the Navy's policy of having only a "general Protestant" service and restricting other forms of non-liturgical religious services violates both the First Amendment's Establishment and Free Exercise Clauses. *See* Compl at 35. The plaintiffs claim that the defendants have tried to establish a de facto liturgical Christian religion for its personnel, thereby limiting the opportunity for non-liturgical Christian personnel to meet their religious needs. *See id.* By mandating a liturgical "general Protestant" service, the Navy has tried to shape

àll Protestant service members "into a single liturgical worship mold while ignoring or actively hindering the religious needs of non-liturgical personnel." *Id.* The Navy has allegedly done this by denying or restricting non-liturgical Christian chaplains' ability to conduct services by removing non-liturgical Christian chaplains from preaching or conducting religious services and by opposing non-liturgical Christian worship alternatives. *See id.* For example, at the Navy's Naples, Italy base in 1999, there were nine English-speaking non-liturgical churches off-base, some of which met in "substandard facilities which were inadequate to hold the number of those wanting to attend, while Catholic and liturgical Protestants enjoyed spacious on post facilities designed for their styles of worship." *Id.* at 36. Moreover, the plaintiffs assert that senior officials in the Corps have criticized and berated non-liturgical Christian chaplains "for preaching and teaching on truths of the Christian faith and their specific religious tradition." *See id.* at 35.

Concluding this category of allegations, the plaintiffs lay out a broad claim that the Navy's policies and practices exhibit "manifest hostility" to non-liturgical Christian chaplains. *See* Compl. at 45. Specifically, although there are four times as many DON members of non-liturgical Christian faith groups than those of liturgical Protestant denominations, the Navy allegedly allocates chaplain positions in an irrational and arbitrary basis designed to hinder non-liturgical Christian faith groups. *See id.* at 46. The plaintiffs also charge that senior chaplains have intentionally given some non-liturgical Christian chaplains lower performance ratings than similarly situated liturgical Protestant and Catholic chaplains "solely on the basis of their religious identification and beliefs despite evidence of the non liturgical chaplain's superior performance." *Id.* Moreover, the

Navy allegedly has a two-tiered system of discipline, whereby liturgical Christian chaplains receive lighter punishments for similar offenses than their non-liturgical Christian counterparts. *See id.* at 47. In addition, while the Navy provides career-planning information, such as postgraduate education opportunities to liturgical Christian chaplains, it does not give the same type of information to non-liturgical Christian chaplains. *See id.*

In sum, the plaintiffs protest their "second-class" treatment, which allegedly violates the Establishment, Free Exercise, and Free Speech Clauses of the Constitution's First Amendment, and the equal-protection component of the Fifth Amendment's Due Process Clause. *See id.*

Turning to the claims that focus on the Free Exercise Clause, the non-liturgical chaplains charge that some non-liturgical Christian chaplains and similar faith Navy personnel have been denied and selectively excluded from access to Navy facilities on the basis of discrimination against religious speech with a specific viewpoint, i.e., non-liturgical, evangelical, and low-church. *See* Compl. at 42. Essentially, the plaintiffs allege that the Navy's discriminatory policies and hostility deny both non-liturgical Christian chaplains and their would-be congregants their First Amendment constitutional right to the free exercise of their religion by denying or severely limiting their access to chaplains and worship services of their faith groups. *See id.* at 42 (citing 32 C.F.R. § 65.3). The plaintiffs claim that the under-representation of non-liturgical Protestant chaplains limits the ability of these chaplains to meet their community's religious needs. Thus, "non-liturgical chaplains must expend more effort to meet the needs of their faith group members than is required by liturgical Protestant chaplains." *Id.* The plaintiffs

charge that these policies "are deliberately motivated by faith group bias." *Id.* at 43.

In a related claim, the plaintiffs plead that the defendants discriminate against non-liturgical Christian chaplains in violation of the First and Fifth Amendments by unlawfully disapproving the religious speech contained in their non-liturgical Christian tradition. *See id.* at 43–44. In a separate claim, the plaintiffs allege that since the Establishment Clause limits the taxing and spending power conferred by Article I, Section 8 of the Constitution, Congress may not appropriate tax funds to support the Navy's use of such funds to favor one religion, in violation of the Establishment Clause. *See id.* at 45.

Next, the non-liturgical Christian chaplains anticipate a statute-of-limitations defense and claim that the Navy has fraudulently concealed evidence that would support the plaintiffs' causes of action. *See* Compl. at 47–51. That is, the Chaplain Corps "has lied to, misrepresented to, or otherwise mislead [sic] plaintiffs and others who have raised questions about the appearance of quotas, faith group prejudice, and/or the fairness or objectivity of the chaplain promotion and [retention] processes." *Id.* at 48–49. This alleged fraudulent concealment has prevented the plaintiffs and their class from seeking timely redress. *See id.* at 50. Accordingly, the plaintiffs argue that this "deception and concealment" warrants an equitable tolling of any statute of limitations for claims covered by this concealment and equitably estops the Navy from asserting a statute-of-limitations defense. *See id.*

Finally, the Navy has allegedly sought to retaliate and punish the plaintiffs who have brought this lawsuit, and has constructively discharged certain plaintiffs by making their work conditions intolerable to the point that the defendants gave these plaintiffs no choice but to leave the Navy or retire. *See* Compl. at 51. In addition, the non-liturgical Christian chaplains claim that the Navy has violated the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*, by illegally burdening the religious rights of the plaintiffs without a substantial governmental purpose. *See id.* at 51–52.

The plaintiffs seek declaratory relief and a permanent injunction. Among other things, they ask the court to strike down: the Navy's alleged thirds policy; the Navy's practice of placing more than one chaplain on chaplain promotion boards; the Navy's practice of allowing the Chief of Chaplains to determine the makeup of a promotion board or a SERB; the Navy's policy of identifying the faith group of each chaplain to be considered by promotion boards or SERBs; and the Navy's alleged endorsement of "an official liturgical General Protestant service." *See* Compl. at 52–54. In addition, the plaintiffs call for an end to the alleged "dominance of the Navy's senior ranks and key billets by liturgical Protestant chaplains, out of all proportion to their actual percentages in the Navy," as well as the over-representation of liturgical Christian chaplains in the entire Chaplain Corps. *See id.* at 55. In essence, the plaintiffs ask the court for an order directing the Navy to bring both the entire Chaplain Corps and its senior officials "into line with the Navy's religious demographics." *See id.* at 59.

The court now turns to the defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## III. ANALYSIS

### A. Legal Standard for a Motion to Dismiss

On a motion to dismiss pursuant to Rule 12(b)(1), the plaintiff bears the burden of

establishing that the court has jurisdiction. *See District of Columbia Retirement Bd. v. United States,* 657 F.Supp. 428, 431 (D.D.C.1987). In evaluating whether subject-matter jurisdiction exists, the court must accept all the complaint's well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overturned on other grounds by Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations. *See, e.g., Lawrence v. Dunbar,* 919 F.2d 1525, 1529 (11th Cir.1990).

Moreover, the court need not limit itself to the allegations of the complaint. *See Hohri v. United States,* 782 F.2d 227, 241 (D.C.Cir.1986), *vacated on other grounds by* 482 U.S. 64, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987). Rather, the court may consider such materials outside the pleadings as it deems appropriate to determine whether it has jurisdiction in the case. *See Herbert v. National Academy of Sciences,* 974 F.2d 192, 197 (D.C.Cir.1992).

For a complaint to survive a Rule 12(b)(6) motion to dismiss, it need only provide a short and plain statement of the claim and the grounds on which it rests. *See* FED. R. CIV. P. 8(a)(2); *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). A motion to dismiss under Rule 12(b)(6) tests not whether the plaintiff will prevail on the merits, but instead whether the plaintiff has properly stated a claim. *See* FED. R. CIV. P. 12(b)(6); *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683. The plaintiff need not plead the elements of a prima-facie case in the complaint. *See Sparrow v. United Air Lines, Inc.,* 216 F.3d 1111, 1114 (D.C.Cir.2000). Thus, the court may dismiss a complaint for failure to state a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Atchinson v. District of Columbia,* 73 F.3d 418, 422 (D.C.Cir.1996). In deciding such a motion, the court must accept all the complaint's well-pled factual allegations as true and draw all reasonable inferences in the nonmovant's favor. *See Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683.

## B. The Appropriate Standard of Review

Before the court assesses the constitutionality of the defendants' various policies and practices at issue, the court must first determine what the appropriate standard of review should be in this case. While the parties disagree about some of the applicable standards and find common ground on others, the court determines that the constitutional issues implicated by this dispute are sufficiently intricate to warrant an exacting discussion of the applicable standards of review. Accordingly, the court will separate the plaintiffs' allegations into the three major constitutional rubrics the complaint discusses: alleged violations of the Establishment Clause, the Free Exercise Clause and the Equal Protection Clause. The court will consider in turn, then, the appropriate standard of review for each category.

### 1. Establishment Clause Claims

As noted previously, most First Amendment religion cases deal with a challenge to a governmental law or policy that allegedly benefits or hinders religion as compared to non-religion. The case at bar, however, raises the *much rarer* type of First Amendment religion case in which the plaintiffs allege that a law or policy benefits one religious group over another. In these cases, the Supreme Court stands on even more heightened alert than in

cases involving religion as opposed to the secular. Because the Supreme Court has established two distinct tests depending on which type of Establishment Clause case is at issue, and because the parties disagree about which test should apply, the court will begin its inquiry with an analysis of the relevant Supreme Court precedent.

### a. *Lemon* or *Larson?*

The seminal Establishment Clause case involving religion as it relates to non-religion was *Lemon v. Kurtzman,* in which the Supreme Court struck down Rhode Island and Pennsylvania laws designed to provide state aid to boost the salaries of parochial-school teachers. *See* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The Court held that the laws were unconstitutional because they promoted "excessive entanglement between government and religion." *See id.* at 614, 91 S.Ct. 2105. In addition, the Court enunciated a three-pronged test for examining cases in which governmental action allegedly sponsored or hindered religion: to pass constitutional muster, (1) the statute must have a secular legislative purpose; (2) its principal or primary effect must be one that neither advances nor inhibits religion; and (3) the statute must not foster "an excessive government entanglement with religion." *See id.* at 612–13, 91 S.Ct. 2105 (internal citations omitted).[16]

In subsequent cases, the Supreme Court has used the *Lemon* test to both uphold and strike down statutes. Declaring that a church's seeking to advance religion is permissible while a similar attempt on the government's part is impermissible, the Court upheld a law exempting religious organizations from federal civil rights statutes that prohibited employment discrimination on the basis of religion. *See Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Amos,* 483 U.S. 327, 337–40, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987); *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) (upholding the constitutionality of the Nebraska legislature's practice of opening each session with a prayer by a chaplain paid with public funds). On the other hand, the Court deemed unconstitutional a New York statute creating a special school district for a small village inhabited by members of one religious sect, the Satmar Hasidim, because it violated the religion clauses' neutrality principal since its primary effect was to advance religion. *See Board of Ed. of Kiryas Joel Vill. Sch. Dist. v. Grumet,* 512 U.S. 687, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994).

The second line of cases began with *Larson v. Valente,* in which the Supreme Court first applied a strict-scrutiny analysis, rather than the less rigorous *Lemon* test. *See* 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). The Court stated that while *Lemon's* three-pronged test was appropriate in cases where the government arguably benefited or impeded religion as a whole in relation to the secular, in cases in which government allegedly prefers one religion over another, the more demanding strict-scrutiny analysis applies.[17] *See id.*

---

16. Much has been written about the interplay between the Establishment Clause and the Free Exercise Clause. The *Lemon* test itself underscores this point. The test's second prong examines whether a law has the effect of inhibiting religion. *See Lemon,* 403 U.S. at 612, 91 S.Ct. 2105. Undoubtedly, if a law's principal or primary effect inhibits religion, such a statute would also raise free exercise concerns. For more on the relationship and the "natural antagonism between the two clauses," *see* Ronald D. Rotunda & John E. Nowak, 5 Treatise on Constitutional Law § 21.1 (3d ed.1999).

17. Although the Court explicitly held that *Lemon's* three-pronged test did not apply in these denominational-preference cases, the

at 246, 102 S.Ct. 1673. In *Larson*, the Court considered a section of Minnesota's Charitable Solicitations Act that provided that only those religious organizations receiving more than 50 percent of their funds from nonmembers were subject to the Act's registration and reporting requirements. *See id.* at 230, 102 S.Ct. 1673. The Unification Church, which relied heavily on fundraising from nonmembers, brought suit, charging that the 50–percent rule discriminated against its organization in violation of the Establishment Clause. *See id.* Demanding strict adherence to the "principal of denominational neutrality," the Court held that:

> "[t]he fullest realization of true religious liberty requires that government . . . effect no favoritism among sects . . . and that it work deterrence of no religious belief." In short, when we are presented with a state law granting a denominational preference, our precedents demand that we treat the law as suspect and that we apply strict scrutiny in adjudging its constitutionality . . . . Consequently, that [law] must be invalidated unless it is justified by a compelling governmental interest . . . and unless it is closely fitted to further that interest.

*Id.* at 246–47, 102 S.Ct. 1673 (internal quotation omitted).

Faced with evidence that Minnesota had conducted religious gerrymandering to help the Roman Catholic archdiocese avoid reporting requirements and to force the Unification Church to report, the Court raised concerns about the "risk of politicizing religion." *See id.* at 254, 102 S.Ct. 1673. Leaving nothing to doubt, the Court declared that "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Id.* at 244, 102 S.Ct. 1673.

In the case at bar, the plaintiffs clearly allege that the Navy, through its policies and practices, is favoring chaplains of liturgical Christian faiths over those of non-liturgical Christian faiths. *See, e.g.,* Compl. at 4, 23, 30. The plaintiffs' Establishment Clause claims, therefore, implicate the Supreme Court's *Larson* line of cases rather than *Lemon* and its progeny. *See Larson,* 456 U.S. at 246, 102 S.Ct. 1673. Despite what should be readily apparent, the defendants would have the court believe that the D.C. Circuit has somehow overruled the Supreme Court on this issue. *See* Mot. to Dismiss at 10 n. 7. Specifically, the defendants seem to contend that despite *Larson's* clear holding that courts should apply strict scrutiny when assessing laws or policies creating denominational preferences, "this Circuit has expressly reviewed the language in *Larson* and has chosen to continue applying the *Lemon* test even to laws that provide benefits to a specific religious sect that are not provided to other sects." *Id.*

In support of this proposition, the defendants point to one footnote in a D.C. Circuit case. *See id.* (citing *United Christian Scientists v. Christian Science Bd. of Directors,* 829 F.2d 1152, 1162 n. 49 (D.C.Cir. 1987)). In *United Christian Scientists,* the Court of Appeals affirmed a district court ruling that a law granting a church the extended copyright on all editions of a religious text violated the Establishment Clause, and chose to apply the *Lemon* test rather than the *Larson* test. *See United Christian Scientists,* 829 F.2d at 1162 n. 49. Despite the defendants' contention, the Court of Appeals made it clear that one of

---

Court did observe that the anti-entanglement prong was relevant in *Larson*. *See id.* at 252,

102 S.Ct. 1673.

the main reasons it chose to apply *Lemon* was because "*Larson's* application to the case at bar was neither considered by the district court, nor argued before us." *See id.* While the Court of Appeals did state that, "[t]he [Supreme] Court has never returned to elaborate upon the doctrinal development it announced in *Larson*," *id.*, the defendants' implication that this single statement signaled the D.C. Circuit's intent not to follow binding precedent from a Supreme Court case (decided only five years earlier) strikes the court as a significant overstatement.

The course of chronological events further undermines the defendants' position. The D.C. Circuit decided *United Christian Scientists* on September 22, 1987. But on June 24, 1987—three months earlier—the Supreme Court decided *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, and left no doubt about the continuing vitality of *Larson*: "*Larson* indicates that laws discriminating *among* religions are subject to strict scrutiny, and that laws 'affording a uniform benefit to *all* religions' should be analyzed under *Lemon*." *See Amos*, 483 U.S. at 339, 107 S.Ct. 2862 (internal citation omitted).[18] Moreover, two years later, in *County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter*, the Court reiterated *Larson's* enduring importance: "we have expressly required 'strict scrutiny' of practices suggesting 'a denominational preference.'" 492 U.S. 573, 608–09, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (quoting *Larson v. Valente*, 456 U.S. at 246, 102 S.Ct. 1673) (holding that while a county's display of a crèche violated the Establishment Clause, its display of a menorah next to a Christmas tree did not have the unconstitutional effect of endorsing Christianity and Judaism).[19] In sum, the court rejects the de-

**18.** The court notes that it has no explanation for why the D.C. Circuit would have said that the Supreme Court has never returned to the "doctrinal development it announced in *Larson*" when the Supreme Court had, in fact, returned to the *Larson* doctrine only three months before the D.C. Circuit decided *United Christian Scientists. See United Christian Scientists*, 829 F.2d at 1162 n. 49. This apparent confusion, however, does not excuse the defendants from performing their own independent case research, especially when even a rather cursory examination would have revealed that the *Larson* doctrine retains its status as important Supreme Court precedent.

**19.** Interestingly, contrary to the defendants' assertion, the *Lemon* test has come under more serious questioning than the *Larson* test. In 1994, Supreme Court Justice Sandra Day O'Connor challenged *Lemon's* continuing relevance and proposed an alternative standard: "[a]s the Court's opinion today shows, the slide away from *Lemon's* unitary approach is well under way. A return to *Lemon*, even if possible, would likely be futile, regardless of where one stands on substantive Establishment Clause questions. I think a less unitary approach provides a better structure for anal-

ysis." *Grumet*, 512 U.S. 687, 721, 114 S.Ct. 2481 (O'Connor, J., concurring).

Three years later, the Court somewhat "repackaged" *Lemon*, as some commentators have described it. *See* Rotunda and Nowak, 5 Treatise on Constitutional Law § 21.3. In *Agostini v. Felton*, Justice O'Connor wrote the majority opinion that recast how the Court would examine whether government aid unconstitutionally advances religion. *See* 521 U.S. 203, 234, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). While courts should continue to evaluate a law's purpose, effect, and level of entanglement with religion, the majority held that in assessing the effect of a law or policy, courts should determine whether the government aid "result[s] in governmental indoctrination; define[s] its recipients by reference to religion; or create[s] an excessive entanglement." *See id.* Essentially, the Court folded *Lemon's* third prong—whether a statute fosters an excessive entanglement with religion, *see Lemon*, 403 U.S. at 613, 91 S.Ct. 2105—into the new test for the "effect" prong. *See Agostini*, 521 U.S. at 222–23, 233–34, 117 S.Ct. 1997. In arguing for *Lemon's* continued primacy, the defendants never mention *Agostini's* modification of the *Lemon* test.

fendants' theory that the D.C. Circuit has somehow abrogated the Supreme Court's decision in *Larson*. On the contrary, *Larson* remains alive and well, and its strict-scrutiny standard applies to this case.

### b. Should Relaxed Strict Scrutiny Apply?

■ Moving on, the defendants argue that the Supreme Court has adapted its application of the strict-scrutiny test to the unique circumstances that exist within the military, and that the court should thus apply "a more deferential application of the strict scrutiny test." *See* Mot. to Dismiss at 11. To buttress their contention, the defendants rely heavily on the Supreme Court decision in *Goldman v. Weinberger*, which upheld an Air Force regulation prohibiting an Orthodox Jew from wearing a yarmulke because the Air Force had a strong interest in discipline that justified the strict enforcement of its uniform-dress requirement. *See* 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986). In *Goldman*, the petitioner claimed that the First Amendment's Free Exercise Clause allowed him to wear a yarmulke while in uniform even though this would violate Air Force regulation 35–10, which said that no military personnel shall wear headgear while indoors except for armed security police in the performance of their duties. *See id.* at 505, 106 S.Ct. 1310. In rejecting the petitioner's challenge, the Court stated that, "[o]ur review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society." *Id.* at 507, 106 S.Ct. 1310.

But the *Goldman* case differs from the case at bar in several crucial respects. First, *Goldman* dealt with a regulation that involved inherently operational, strategic, or tactical matters. *See id.* at 507–09, 106 S.Ct. 1310. The challenged regula-tion related directly to the military's role in conducting national defense. Indeed, the Supreme Court emphasized this point in its decision and explained that the uniform-dress requirement played a significant part in an operational function of the military:

> The considered professional judgment of the Air Force is that the traditional outfitting of personnel in standardized uniforms encourages the subordination of personal preferences and identities in favor of the overall group mission. Uniforms encourage a sense of hierarchical unity by tending to eliminate outward individual distinctions except for those of rank. The Air Force considers them as vital during peacetime as during war because its personnel must be ready to provide an effective defense on a moment's notice; the necessary habits of discipline and unity must be developed in advance of trouble. We have acknowledged that "[t]he inescapable demands of military discipline and obedience to orders cannot be taught on battlefields; the habit of immediate compliance with military procedures and orders must be virtually reflex with no time for debate or reflection."

*Id.* at 508, 106 S.Ct. 1310 (internal quotation omitted).

Conversely, in the instant case, the issues revolve around considerations that are not related to strictly military affairs or to the defense of the country. That is, the policies at issue here are designed to hire, retain, and promote chaplains to satisfy the religious needs of Navy service members. These policies relate to quality-of-life issues for military personnel and have no specific operational, strategic, or tactical objective. As the defendants themselves acknowledge, Congress provided for the creation of the Navy's Chaplain Corps "to provide for the *religious needs*

of Navy personnel." *See* Mot. to Dismiss at 4 (citing 10 U.S.C. § 5142) (emphasis added). Moreover, the defendants never try to articulate how the challenged policies and practices—e.g., alleged religious preferences for liturgical Christian chaplains—would further any operational, strategic, or tactical objectives. Indeed, this court is at a loss to see how the defendants could even argue that the alleged policies designed to favor liturgical Christian chaplains could possibly advance an important military objective.

The defendants suggest unconvincingly that because this case places the First Amendment in the military context, the Navy's chosen policies deserve "substantial deference." *See* Mot. to Dismiss at 18. But since operational or strategic considerations are not at issue, the court need not give the military the same level of deference in this case that it otherwise might. Furthermore, the cases the defendants rely on actually weaken their argument. For example, the defendants point to *Katcoff v. Marsh* for the proposition that:

> when a matter provided for by Congress in the exercise of its war power and implemented by the Army appears *reasonably relevant and necessary to furtherance of our national defense* it should be treated as presumptively valid and any doubt as to its constitutionality should be resolved as a matter of judicial comity in favor of deference to the military's exercise of its discretion.

*Katcoff v. Marsh*, 755 F.2d 223, 234 (2d Cir.1985) (internal citations omitted) (emphasis added); *see also* Defs.' Reply ("Reply") at 4. While the *Katcoff* court—which upheld the constitutionality of the Army's Chaplain Corps as a whole—said that making religion available to soldiers qualified as a crucial imperative, the Navy has not

articulated any reason why their policies and practices that allegedly favor liturgical Christianity and inhibit non-liturgical Christianity are "reasonably relevant and necessary to furtherance of our national defense . . . ." *See Katcoff*, 755 F.2d at 234. Accordingly, the relaxed strict-scrutiny standard for some cases involving the military does not apply in this case, and the court will apply the usual strict-scrutiny standard.[20]

The second major distinction between *Goldman* and the instant case is that the former was a Free Exercise Clause case. *See Goldman*, 475 U.S. at 504, 106 S.Ct. 1310. While the instant case involves both Free Exercise Clause and Establishment Clause claims, the defendants offer *Goldman* as ostensible support for the sweeping proposition that in *all* matters relating to the First Amendment and the military, courts should show the armed forces substantial deference. This court rejects such a broad reading of *Goldman*.

In *Goldman*, the case presented the Supreme Court only with Free Exercise Clause issues, not Establishment Clause issues. *See id.* (stating that "Petitioner S. Simcha Goldman contends that the Free Exercise Clause of the First Amendment to the United States Constitution permits him to wear a yarmulke while in uniform . . . ."). The Court drove home this distinction in discussing the balance between an individual service member's conduct and the larger goals of the military:

> the First Amendment does not require the military to accommodate [the wearing of religious apparel such as a yarmulke] in the face of its view that they would detract from the uniformity sought by the dress regulations. . . . The First Amendment therefore does not

---

**20.** Even assuming *arguendo* than a relaxed strict-scrutiny standard should apply to this case, the court's analysis *infra* would remain the same.

prohibit [the regulations] from being applied to [Mr. Goldman] even though their effect is to restrict the wearing of the headgear required by his religious beliefs.

*Id.* at 509–10, 106 S.Ct. 1310. This excerpt clearly demonstrates that the Court was referring to an issue involving an individual's free exercise of religion, rather than a prohibition on governmental action that an Establishment Clause claim would raise. In sum, while *Goldman* supports the proposition that an individual service member's First Amendment right to the free exercise of his religion may be limited in certain circumstances involving the military, the Court has never expanded this rationale to Establishment Clause cases. Barring an explicit directive from the Supreme Court or the D.C. Circuit to do so, this court refuses to take the first step down that slippery slope.

One final point merits discussion. As one district judge has stated in a similar case brought by an active-duty chaplain in California, "[a]lthough this Court is mindful of the Supreme Court's admonishment that the judiciary should give substantial deference to matters related to management of the military, such protection does not extend to practices that may subvert one's inalienable constitutional rights." *Sturm v. United States Navy*, Dkt. No. 99cv2272 at 7 (S.D.Cal.2000). This court wholeheartedly agrees. In this case, the defendants seem to be telling the court that even if a case implicates crucial constitutional protections, the defendants should still prevail simply because the case involves the military.

To some extent, the defendants' confusion is understandable. While the Supreme Court's legal standard is relatively clear for Establishment Clause cases, *Goldman's* instruction for courts to accord "great deference" to the professional judgment of military authorities involving policies or practices that affect First Amendment free exercise claims provides the lower federal courts with little clear guidance. *See Goldman*, 475 U.S. at 507, 106 S.Ct. 1310. Not surprisingly, the plaintiffs interpret the term "great deference" to mean that courts should still apply strict scrutiny to these cases. But interestingly, the defendants themselves interpret the term "great deference" to mean "a more deferential application of the strict scrutiny test." *See* Mot. to Dismiss at 11.

In her dissent in the *Goldman* case, Justice O'Connor highlighted the lack of a standard in criticizing the majority on the ground that "[n]o test for free exercise claims in the military context is even articulated, much less applied. It is entirely sufficient for the Court if the military perceives a need for uniformity." *Goldman*, 475 U.S. at 528, 106 S.Ct. 1310 (O'Connor, J., dissenting).[21] Perhaps a future case will provide the Court with an opportunity to take Justice O'Connor's suggestion and give the lower courts additional guidance in evaluating these claims.

## 2. Free Exercise Clause Claims

 Unfortunately, neither party differentiates between the standard of review this court should apply in Free Exercise Clause cases as opposed to Establishment Clause cases. The defendants assert that the court should employ the relaxed strict-scrutiny standard for all three of the plaintiffs' principal claims: namely, those alleging violations of the Establishment Clause, the Free Exercise Clause, and the Equal Protection Clause. But as this court just

---

**21.** In her dissent, Justice O'Connor does in fact articulate a test for evaluating Free Exercise Clause claims in the military context.

*See Goldman*, 475 U.S. at 529–533, 106 S.Ct. 1310 (O'Connor, J., dissenting).

discussed in the previous section, the Supreme Court's ruling in *Goldman*, a free exercise case, is inapplicable to the free exercise claims at issue here because the defendants have totally failed to articulate any reasons why the challenged policies and practices involving the hiring, promotion, and retention of chaplains relate to any important operational, strategic, or tactical objective.

■ Accordingly, the court relies on well-settled Supreme Court precedent in free exercise cases in the non-military context to provide the appropriate legal standard. The Supreme Court has set forth a two-track approach:

a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice. . . . A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest.

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). In other words, in cases such as the one at bar in which the plaintiffs allege the defendants' policies and practices are not neutral and are not of general applicability, the court should apply the strict-scrutiny test. *See id.* Moreover, "[a] law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." *Id.* at 546, 113 S.Ct. 2217.

### 3. Equal Protection Clause Claims

■ The plaintiffs argue correctly that the Fifth Amendment requires the Navy to treat non-liturgical Christian chaplains in the same manner that it treats liturgical Protestant chaplains.[22] *See* Pls.' Opp'n at 8 (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 231–32, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995)). Notably, the equal-protection analysis in this case is very similar to the Establishment Clause and Free Exercise Clause standards of review in that, as noted above, the Supreme Court has held courts must apply strict scrutiny to any policy or practice that involves a denominational preference. *See, e.g., County of Allegheny*, 492 U.S. at 608–09, 109 S.Ct. 3086; *Larson*, 456 U.S. at 246, 102 S.Ct. 1673. Because the plaintiffs in this case have alleged that the Navy's policies and practices do involve denominational preferences, the court will apply strict scrutiny to the plaintiffs' equal-protection claims.

### C. Statute–of–Limitations Issues

■ Title 28 U.S.C. § 2401(a) establishes a six-year statute-of-limitations period for a plaintiff to commence a civil action against the United States after the right of action first accrues. *See* Mot. to Dismiss at 28 (citing 28 U.S.C. § 2401(a)). While the parties do not dispute that section 2401(a) sets forth the applicable limitations period, they disagree about when the time period began to accrue.

In essence, the defendants assert that the proper accrual date for claims for discrimination or illegal actions taken against military personnel is when the action or

---

**22.** Because the Fourteenth Amendment's Equal Protection Clause applies only to laws enacted by state and local governments, the Supreme Court has held that the Fifth Amendment's Due Process Clause includes an equal-protection component that can be applied to potential equal-protection violations by the federal government. *See, e.g., Bolling v. Sharpe*, 347 U.S. 497, 498–500, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

discharge becomes final. *See* Mot. to Dismiss at 29 (citing *Kendall v. Army Bd. for Correction of Military Records*, 996 F.2d 362, 365–66 (D.C.Cir.1993)). Accordingly, since the plaintiffs filed their complaint on March 17, 2000, the defendants insist that the statute of limitations bars any claims that accrued before March 17, 1994 and that the court should dismiss these claims for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). *See* Mot. to Dismiss at 29. The defendants thus maintain that the court should dismiss the claims of plaintiffs Timothy Nall and James Wiebling, who left active duty before March 17, 1994. *See id.* at 29–30. Moreover, the defendants contend that because the statute of limitations at issue is jurisdictional, *see Kendall*, 996 F.2d at 366, the court should also dismiss the claims of several other plaintiffs who do not allege when they left active-duty service or when, during service, they suffered their alleged injuries. *See* Mot. to Dismiss at 30.

The plaintiffs counter by contending that the defendants have engaged in a continuous violation and self-concealing fraud. *See* Pls.' Opp'n at 37. The plaintiffs further argue that because the Navy fraudulently concealed crucial information that prevented them from alleging a crucial element of their claim, the "accrual" date was tolled during the period of concealment and did not begin to run until the plaintiffs first learned of the defendants' alleged fraudulent concealment. *See* Pls.' Opp'n at 36 (citing *Hohri v. United States*, 782 F.2d 227, 249 (D.C.Cir.1986), *vacated and remanded on other grounds*, 482 U.S. 64, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987)).

The D.C. Circuit has made it clear that "when a defendant fraudulently conceals the basis of a plaintiff's cause of action, the statute of limitations is tolled until the time that a reasonably diligent plaintiff could have discovered the elements of his claim." *Hohri*, 782 F.2d at 246. The question in this case then becomes whether the defendants fraudulently concealed the basis of the plaintiffs' claims. But this court need not decide the issue at this juncture. This is because the D.C. Circuit has held that "courts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint." *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C.Cir.1996) (citing *Richards v. Mileski*, 662 F.2d 65, 73 (D.C.Cir.1981)). The D.C. Circuit has also instructed that "because statute of limitations issues often depend on contested questions of fact, dismissal is appropriate only if the complaint on its face is conclusively time-barred." *Firestone*, 76 F.3d at 1209 (citing *Richards*, 662 F.2d at 73).[23]

Finally, the plaintiffs correctly submit that they need not plead fraudulent concealment in the complaint, but rather that their obligation to do so "arises only when defendant raises the statute of limitations as a defense." *See* Pls.' Opp'n at 36 (quoting *Firestone*, 76 F.3d at 1210). For all these reasons, the court applies the D.C. Circuit's well-settled precedent and concludes that a ruling on the defendants'

---

**23.** It is worth noting that the defendants' reliance on *Bigelow v. Knight* for the proposition that courts should dismiss a complaint when the plaintiff fails to allege the facts necessary for subject-matter jurisdiction is misplaced since *Bigelow* was a diversity case in which the plaintiff failed to allege the domicile and citizenship of the parties. *See* Mot. to Dismiss at 30 (citing *Bigelow v. Knight*, 737 F.Supp. 669, 670 (D.D.C.1990)). In contrast, "[t]he statute of limitations is an affirmative defense that defendant must prove . . . ." *Firestone*, 76 F.3d at 1210. The D.C. Circuit recognizes that it would be totally illogical for courts to require plaintiffs to include in their complaints counterarguments to a *possible* statute-of-limitations defense that the defendants may or may not raise.

statute-of-limitations argument would be premature. Accordingly, the court denies without prejudice the defendants' motion to dismiss certain claims on limitations grounds and will reconsider the defendants' argument if it is raised in a possible motion for summary judgment after the parties have conducted discovery.

### D. The Defendants' Administrative–Exhaustion Argument

■ The defendants' contention that the individual chaplain plaintiffs should have first exhausted their administrative remedies by raising their personnel claims with the Board for Correction of Naval Records ("BCNR") before coming to federal court warrants little attention. *See* Mot. to Dismiss at 32. The defendants argue that by requiring the plaintiffs to seek their remedies first before the BCNR, an administrative body, the court could enable the Navy itself to correct any mistakes or injustices that may have occurred. *See id.* But the plaintiffs respond persuasively by pointing to a similar case involving the Air Force Board for the Correction of Military Records ("AFBCMR"). *See* Pls.' Opp'n at 43 (citing *Glines v. Wade,* 586 F.2d 675, 678 (9th Cir.1978), *rev'd on other grounds sub nom. Brown v. Glines,* 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980)). In *Glines,* the Ninth Circuit stated that "[t]he AFBCMR was never intended by Congress to resolve the essentially legal issues involved in this case. Like other BCMRs, it is a clemency-oriented body, with authority to 'correct an error or remove an injustice,' 10 U.S.C. § 1552(a), not to declare the law." *Glines,* 586 F.2d at 678. Noting that the BCMRs "are not necessarily legally trained," the court stated that the board lacked the authority to declare the challenged regulations invalid. *See id.*

The defendants attempt to distinguish *Glines* by suggesting that in that case, the plaintiff challenged the constitutionality of specific military regulations, whereas the plaintiffs at bar challenge putative "policies," which the Navy's BCNR is equipped to handle. *See* Reply at 21. This argument falls flat. In this case, the gravamen of the plaintiffs' claims revolves around constitutional challenges based on the First Amendment's Establishment and Free Exercise Clauses and the Fifth Amendment's Due Process Clause. As the Ninth Circuit held in an earlier case, "[r]esolving a claim founded solely upon a constitutional right is singularly suited to a judicial forum and clearly inappropriate to an administrative board." *Downen v. Warner,* 481 F.2d 642, 643 (9th Cir.1973). The court rejects the defendants' argument on this point.

### E. The Plaintiffs' Establishment, Free Exercise, and Equal Protection Clause Claims

As discussed *supra* in Section III.B., the court must apply strict scrutiny in assessing which, if any, of the plaintiffs' various causes of action under the three major constitutional rubrics may survive the defendants' motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Accordingly, because the legal standards are the same, the court addresses these claims together.

#### 1. The Hiring and Retention of Navy Chaplains

■ The plaintiffs allege that the Navy has established and maintained an unconstitutional religious quota system, which "allow[s] liturgical Protestant chaplains to maintain liturgical control of the Navy Chaplain Corps while excluding non-liturgical chaplains from influence and representation." Compl. at 30. Charging that the thirds policy amounts to an unconstitutional establishment of liturgical Christianity, the plaintiffs decry a structure that leads to a much greater percentage of liturgical Christians in the Chaplain Corps

than their proportionate rate among all DON personnel.

In support of their claim, the plaintiffs provide hard statistics. Specifically, the DMDC reports indicate that liturgical Protestants comprised about 8.76 percent and 8.03 percent of all DON personnel in 1998 and 2000 respectively. *See* Compl. at 28 (citing Exs. 1, 2). In addition, Catholics represented 24.09 percent of all DON personnel in 1998, and 23.56 percent in 2000. *See id.* In contrast, members of non-liturgical faith groups represent about 50 percent of the Navy's religious population. *See id.* at 28. Under the alleged thirds policy, however, Catholics and liturgical Christians combined, who constituted 32.85 percent of all DON personnel in 1998 and 31.59 percent in 2000, received two-thirds (66–67 percent) of all the Navy's chaplain slots. *See id.* at 29–30.

The defendants respond somewhat feebly that the statistics cited by the plaintiffs are unreliable because they are based on voluntary declarations of religious affiliation made by service members when they entered the Navy. *See* Mot. to Dismiss at 16. Without offering a better system to identify its personnel's religious demographics, the defendants explain that some Navy personnel may choose not to declare their religion, some may change their affiliation after filling out the form, and some may declare their affiliation but not attend worship services or use the ministry resources of the chaplains. *See id.* The Navy also notes that there is far greater turnover among Navy personnel than there is in the Chaplain Corps, making it more difficult to determine religious affiliation among all service members. *See id.*

n. 9. Moreover, the defendants contend that if they tried to collect more precise data on the religious affiliation of their personnel, this would entail significant interference by the Navy into its personnel's free exercise and privacy rights that "would constitute inappropriate entanglement by the government into the worship and beliefs of Navy personnel." *See id.* Without engaging in an extended colloquy on this point, suffice it to say that this court views the defendants' argument as rather far-fetched. For example, to obtain more information about its personnel, the Navy could circulate a voluntary biographical form once per year, and the form could be submitted anonymously to avoid any infringement on a service member's privacy rights.

But the more important point is that the defendants, in proffering their various protestations to the plaintiffs' statistics, seem to have forgotten a fundamental procedural mantra that this court must follow. That is, in ruling on a motion to dismiss, the court must accept the plaintiffs' well-pled factual allegations as true and draw all reasonable inferences in the plaintiffs' favor. *See Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683. In this case, the court determines that the statistics the plaintiffs cite are indeed well-pled factual allegations. Rather than being concocted by the plaintiffs, the statistics about the Navy's religious demographics—taken at two separate points in time—come from an independent third party. And taken in conjunction with their allegations about the thirds policy, the plaintiffs have properly asserted that the Navy intentionally[24]

---

**24.** The court notes the importance of the government's intent in the Establishment Clause calculus. The majority in the Supreme Court case of *Larson v. Valente* did not specify whether strict scrutiny would also apply when the facts show no evidence of the government's intent to prefer one sect over another but merely a disparate effect on various sects. *See Larson,* 456 U.S. 228, 102 S.Ct. 1673. The *Larson* Court consistently stressed that it had evidence showing that the "statute does not operate evenhandedly, nor was it de-

hires liturgical Protestant chaplains dramatically out of proportion from their overall representation among DON personnel.

Similarly, in terms of the defendants' retention policies, the plaintiffs clearly offer well-pled factual allegations that the Navy institutes "a deliberate, systematic, discriminatory" retention policy "whose purpose was to keep non-liturgical chaplains from continuing on active duty, thus ensuring they would not be considered for promotion and minimizing their future influence." Compl. at 31. To pursue this alleged objective, the defendants would retain liturgical Protestant chaplains beyond their initial three-year tour of service and at a significantly higher rate than their representation among all DON personnel. *See id.* at 31–32.

Applying the legal standard to the facts of this case, the court holds that the plaintiffs have stated a claim that the defendants' policies and practices relating to the hiring and retention of chaplains violate the Establishment Clause of the First Amendment. Underscoring its unwavering adherence to the "principle of denominational neutrality," *see Larson,* 456 U.S. at 246, 102 S.Ct. 1673, the Supreme Court declared that "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Id.* at 244, 102 S.Ct. 1673. This is precisely what the

plaintiffs in this case allege that the Navy has done.

At times, reading the attorneys' briefs in this case is like attending a debate in which the participants have shown up in two different rooms. While the lawyers have clearly put significant time, energy, and thoughtfulness into their briefs, they sometimes fail to directly address the other party's key point. For example, the plaintiffs ask the court for an order requiring the Navy to bring its Chaplain Corps, including its current rank structure, in line with the Navy's religious demographics. *See* Compl. at 59. But the defendants use this fact to launch a misconstruction of the plaintiffs' argument, interpreting it to mean that in order to pass constitutional muster, the Navy Chaplain Corps "must be organized along the denominational breakdown that matches the proportional presence of faith groups in the overall Navy population . . . ." *See* Mot. to Dismiss at 8. While the plaintiffs would approve of a proportional-representation scheme and, indeed, essentially ask for such an approach, nowhere do they insist that this is the *only* constitutional option. Rather, the plaintiffs' main point is that the defendants' current system for hiring and retaining chaplains is unconstitutional.

As discussed at length in Section III.B. *supra,* this case requires the court to apply a strict-scrutiny test to practices suggesting a denominational preference. *See County of Allegheny,* 492 U.S. at 608–09,

---

signed to do so . . . ." *Id.* at 253, 102 S.Ct. 1673.

Similarly, in this case, the plaintiffs allege that the Navy has deliberately adopted policies designed to maintain liturgical Christian control over the Chaplain Corps. For instance, the plaintiffs claim that the Navy used objective criteria, i.e., national religious demographics, to allocate chaplains until the late 1980's, but switched to subjective criteria when it began to notice large losses in liturgi-

cal Protestant faith groups. *See* Pls.' Opp'n at 17. "[T]he motivation for this change was the Navy Chaplain Corps' liturgical hierarchy's fear of non-liturgical chaplains gaining power and influence while liturgicals lost control." *Id.* Because the plaintiffs have clearly alleged an intentional preference, the court need not address what standard of review should apply to cases in which plaintiffs claim a disparate effect on a religious sect.

109 S.Ct. 3086. Consequently, the governmental policy or practice "must be invalidated unless it is justified by a compelling governmental interest, and unless it is closely fitted to further that interest . . . ." *Larson*, 456 U.S. at 247, 102 S.Ct. 1673 (internal citations omitted).

Instead of articulating how its policies and practices regarding the Chaplain Corps are justified by a compelling governmental interest and how its policies and practices are closely fitted to further that interest, the defendants spend much of their time telling the court what is wrong with a proportional-representation system. The parties agree that "the Chaplain Corps exists to serve a compelling governmental interest providing for the free exercise needs of the [DON personnel]." Pls.' Opp'n at 13; Mot. to Dismiss at 12. But the plaintiffs question how the Navy accomplishes its compelling government interest by:

a) its over-representation of chaplains of the Protestant Liturgical faith groups whose members represent about 8% of the Navy and b) its consequent under representation [sic] of non-liturgical chaplains whose members represent the majority of the Navy's religious needs. The Navy has not explained how it determines its chaplain allocations among faith groups and why 8% of the Navy's religious population receives [more than four times that percentage] of the Chaplain authorizations.

Pls.' Opp'n at 13. In short, the plaintiffs challenge both prongs of the strict-scrutiny test, disputing how the Navy's policies and practices justify its compelling governmental objective of meeting the free-exercise needs of DON personnel and how these policies and practices are narrowly tailored to accomplish that objective. *See id.* at 15. The defendants respond that their decision not to adopt a proportional-representation policy passes the strict-scrutiny test as applied to the unique context of the military. *See* Mot. to Dismiss at 19. But as discussed in section III. B.1.b *supra*, a relaxed strict-scrutiny test does not apply to these facts.

Another misreading of the plaintiffs' argument appears in the defendants' effort to make a point about the compelling interest of meeting their personnel's ability to practice their religion. The defendants urge that they must ensure that the Chaplain Corps includes a broad spectrum of religious faiths:

To guarantee such diversity of religious denominations in the Chaplains [sic] Corps—and thereby maintain a capacity to serve a broad segment of faiths—it is permissible for the Navy to take into account the denomination of chaplains in order to regulate the faith group composition with the Corps. Only by considering an individual chaplain's faith group can the Chaplain Corps effectively structure itself to meet the free exercise needs of the Navy and serve its vital support role in the Navy's mission. Indeed, there is no other practicable way to insure that the Chaplain Corps will have a diverse and sufficient supply of chaplains from various faiths without taking denomination into account in filling its staffing needs.

Mot. to Dismiss at 13. Unfortunately, the defendants confuse two of the plaintiffs' arguments. While the plaintiffs do challenge the Navy's policy of identifying the religious denomination of a chaplain being considered for promotion, *see infra* Section III.E.2, the plaintiffs *never argue* with the notion that the Navy must consider religious affiliation in making its hiring decisions. Indeed, the plaintiffs' request for a proportional-representation system in the Chaplain Corps that would mirror the religious demographics of all DON personnel

necessarily contemplates taking faith into account in hiring decisions. *See* Compl. at 59.

Moreover, the defendants seem to forget that at this early stage in litigation, the crucial inquiry is not whether a proportional representation scheme is practicable or mandated by the Constitution, but whether the plaintiffs have stated a claim that the defendants' hiring and retention policies violate the Establishment Clause.[25] *See* FED. R. CIV. P. 12(b)(6); *Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683 ("When a federal court reviews the sufficiency of a complaint ... [t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."). In their attempt to do so, the plaintiffs stress that the policies and practices challenged here are unique to the Navy, and that the other branches of the Armed Forces, the Army and the Air Force, "meet their obligations to provide for the religious free exercise needs of their service members under the same general service constraints which the Navy argues require it to ignore the Constitution." Pls.' Opp'n at 2. In brief, the plaintiffs assert that although the First Amendment does not contain the words "proportional representation," it does mandate neutrality among faith groups. *See id.* at 13. Arguing that the thirds policy amounts to a "religious gerrymander," the plaintiffs charge that the Navy does not explain how its subjective allocation of chaplains between faith groups is neutral. *See id.* at 12–13. "When compared to its religious demographics, the Navy's allocation of chaplains conveys a message of preference." *Id.* at 14.

The court holds that the plaintiffs have stated a claim that the defendants' policies and practices relating to the hiring and retention of its chaplains are not justified by a compelling governmental objective and are not narrowly tailored to accomplish that objective. Accordingly, the plaintiffs have successfully stated a claim that these policies and practices violate the strict-scrutiny test and that they violate the Establishment Clause. The court thus denies the defendants' motion to dismiss these claims.

### 2. The Navy's Promotion of Chaplains [26]

The plaintiffs challenge several of the defendants' policies and practices relating to chaplain promotion boards. For the

---

25. For this reason, the court need not address at this juncture the parties' considerable dialogue concerning the defendants' hypothetical scenario, which purportedly demonstrates the pitfalls of a proportional-representation scheme. *See* Mot. to Dismiss at 17 n. 10.

26. The plaintiffs have also moved for partial summary judgment on several aspects of the Navy's chaplain-promotion system. *See* Pls.' Opp'n to Defs.' Mot. to Dismiss and Pls.' Mot. for Partial Summ. J. at 19–32. The plaintiffs' motion presents evidence outside the pleadings and asks the court to convert the defendants' motion to dismiss into the plaintiffs' motion for partial summary judgment. The court refuses to do so, and agrees with the defendants that even assuming *arguendo* that the plaintiffs' request was a proper procedural maneuver, the court would still deem it inappropriate to treat any of the motions before the court as a motion for summary judgment when the defendants have not had an opportunity to submit any extra-pleading materials. *See* Reply at 3 n. 1. In addition, the court makes clear that it has not considered any of the plaintiffs' extra-pleading exhibits in deciding the instant motions.

Lastly, the plaintiffs have also filed a separate motion for partial summary judgment, which seeks to strike down the Navy's alleged thirds policy. As explained in the court's order dated September 28, 2001 and the order accompanying this Memorandum Opinion, the court will consider the parties' views in their joint status report and will then set forth appropriate briefing schedules for both of these motions.

reasons that follow, the court grants in part and denies in part the defendants' motion to dismiss these causes of action for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Specifically, the court grants the defendants' motion to dismiss the plaintiffs' claims that chaplains should not rate other chaplains and that more than one chaplain should not sit on a chaplain promotion board. On the other hand, the court denies the defendants' motion to dismiss the plaintiffs' claim that a chaplain's religious affiliation should not be identified to a chaplain promotion board.

### a. The Composition of Chaplain Promotion Boards

Responding to the plaintiffs, the defendants argue that as duly appointed Naval officers, chaplains, as with any of the other staff-corps officers, "legitimately participate in the normal course of duties for officers, including sitting on appropriate promotion boards and rating the performance of junior officers. These actions do not run afoul of the Establishment Clause." Mot. to Dismiss at 20. The defendants also take issue with the plaintiffs' claim that placing more than one chaplain on a promotion board discriminates on the basis of religious faith. *See id.* The court agrees that the plaintiffs have failed to state a claim on both points.

### i. Allowing Chaplains to Rate Other Chaplains

█ First, the court holds that the practice of allowing chaplains to rate other chaplains for promotions does not state a violation of the Establishment Clause. Pressing their argument on this point, the plaintiffs claim that unlike the Army and Air Force, which use selection boards comprised of officers from other branches to select chaplains for promotion, chaplains dominate the Navy's chaplain promotion boards. *See* Compl. at 37. The plaintiffs

argue that this practice constitutes a First Amendment violation because "[t]he opportunity for mischief is to [sic] great." *See* Pls.' Opp'n at 32. Essentially, the plaintiffs ask the court to believe that the usual rule for a chaplain sitting on a promotion board will be to discriminate against promotion candidates on the basis of religious denomination. The court refuses to accept that assumption.

Well-settled case law instructs courts to presume that government officials will conduct themselves properly. As this court has said, "government officials are presumed to act in good faith. . . . [p]laintiff must present 'well-nigh irrefragable proof' of bad faith or bias on the part of governmental officials in order to overcome this presumption." *China Trade Center, L.L.C. v. Washington Metro. Area Transit Auth.*, 34 F.Supp.2d 67, 70–71 (D.D.C. 1999), *aff'd*, No. 99–7029, 1999 WL 615078 (D.C.Cir.1999) (per curiam) (stating that decisions of governmental officials "are entitled to a presumption of validity"); *see also Chaplaincy of Full Gospel Churches v. Danzig*, Dkt. No. 99–2945, Mem. Op. and Order dated February 14, 2000 at 4 (D.D.C.2000) (Green, J.).

In addition, the plaintiffs' argument on this point is highly speculative. The defendants underscore this weakness by noting that merely because an official could *possibly* use his or her authority to impermissibly infringe on religious liberty cannot state a violation of the First Amendment. *See* Reply at 8. "Only if an official *in fact* acts to infringe religious liberty in an unconstitutional manner is there a First Amendment violation that the courts can take cognizance of and, generally, remedy." *Id.* As it stands now, the plaintiffs would have great difficulty in demonstrating that they have suffered the injury-in-fact necessary to have standing to bring such a claim. *See Lujan v. Defenders of*

*Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In sum, the defendants correctly maintain that the plaintiffs' assertion that chaplains will necessarily discriminate against other chaplains on the basis of religion is an unsupported allegation that is not sufficient to state a claim for a First Amendment violation.

Another persuasive reason to allow chaplains to rate other chaplains is that the Chaplain Corps fulfills a unique mission within the Navy that requires it to perform duties significantly different from those of Naval line officers and Naval officers in other staff corps. "Consequently, officers in the Chaplain Corps are much better qualified by reason of their knowledge and experience to review and analyze the performance of other chaplains in fulfilling their duties within the Corps." Mot. to Dismiss at 21. As this court has observed:

> Staff corps promotion boards have been traditionally composed of officers who are members of the same staff corps. In this manner, doctors consider doctors, judge advocates consider judge advocates and so on. The logic is apparent. Those in the same profession are more qualified to evaluate others in their profession. It is neither likely that a doctor would know how to evaluate a chaplain, nor vice versa.

*Emory v. Secretary of the Navy,* 708 F.Supp. 1335, 1339 (D.D.C.1989) (Green, J.) (internal citations omitted). The court agrees with this line of reasoning and grants the defendants' motion to dismiss the plaintiffs' claim that chaplains should not rate other chaplains.

## ii. Having More than One Chaplain on a Chaplain Promotion Board

The plaintiffs' second attack on chaplain promotion boards centers on their claim that having more than one chaplain on a board would provide an opportunity for religious bias because selection boards will inherently discriminate among religious denominations based on their own preferences. *See* Mot. to Dismiss at 21 n. 14. For substantially the same reasons as those articulated in the previous section, the court determines that the plaintiffs have failed to state a claim that this practice violates the First Amendment.

Title 10 U.S.C. § 612 states that a Navy chaplain selection board shall consist of five or more officers who are on the Navy's active-duty list. *See* 10 U.S.C. § 612(a)(1). In this case, the plaintiffs never explain why having one chaplain on a promotion board is constitutional, but having more than one chaplain is unconstitutional. Can a chaplain somehow restrain herself from discriminating on the basis of religious affiliation if she is the only chaplain on a board but not hold back from making biased decisions if other chaplains sit on the board? This argument defies common sense.

Finally, the plaintiffs' contention that having chaplains rate other chaplains delegates a religious function to the governmental body is unfounded. All chaplains, including the Chief of Chaplains, are officers. *See* 10 U.S.C. § 5142. "The Chief of Chaplains shall be appointed by the President, by and with the advice and consent of the Senate, from *officers* of the Chaplain Corps in the grade of commander or above who are serving on active duty and who have served on active duty in the Chaplain Corps for at least eight years." *Id.* Furthermore, the defendants properly distinguish the authority the plaintiffs rely on, *Larkin v. Grendel's Den,* in which a zoning law effectively gave private churches veto power on the granting of liquor licenses within 500 feet of their church building, by noting that chaplains are Naval officers, not private clergy. *See*

459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982). "As officers, it is appropriate for [chaplains] to undertake the duties routinely performed by Naval officers, including serving on promotion boards." Mot. to Dismiss at 23. The fact remains, Navy chaplains are first and foremost Naval officers. And when chaplains sit on promotion boards, they act as officers who are evaluating a fellow officer's fitness for promotion.

Nothing in the Establishment Clause can be read to mean that the Constitution prevents all chaplains from making any governmental decision, such as whether to promote another officer. Accordingly, the court concludes that the plaintiffs have failed to state a claim on either of their challenges to the composition of chaplain promotion boards.

### b. Identifying the Religious Denomination of a Chaplain– Promotion Candidate

 The plaintiffs fare much better, however, when advancing their argument that an individual chaplain's religious affiliation should not be identified to members of·a chaplain promotion board by having each promotion candidate's three-digit "faith-group identifier" code prominently displayed throughout the promotion-board process. *See* Compl. at 37. "This procedure has no other purpose than to identify the candidate's faith group to the board and thereby create a suspect religious category unrelated to any legitimate Navy objective." *Id.* Despite the defendants' argument that the plaintiffs have failed to state a constitutional claim on this issue, the court deems this argument persuasive. Although they perform religious functions, chaplains should be selected for promotions based on their fitness as officers and as chaplains, rather than the religious message of their sermons.

The plaintiffs also insist that the Fifth Amendment requires that all chaplains be given an equal and fair opportunity for promotion. *See* Pls.' Opp'n at 10. The court agrees that the Navy may not use religious prejudice to set quotas that are unrelated to a compelling governmental interest. *See Adarand,* 515 U.S. at 231–32, 115 S.Ct. 2097; *Larson,* 456 U.S. at 242, 246, 102 S.Ct. 1673. In support of their claim that the Navy disproportionately promotes liturgical Protestant chaplains to the upper ranks of the Chaplain Corps, the plaintiffs point to the Ellis Report, an internal 1995 memorandum from the Marine Corps Chaplain to the Navy's Chief of Chaplains. In the 15 years preceding the report, 119 incumbents held key billets in the Chaplain Corps, only 14 of which, or 11.8 percent, "have been clearly non-liturgical." *See* Compl., Ex. 4. In contrast, Roman Catholics filled 33.6 percent of the billets, while liturgical Christians filled 53.8 percent. *See id.* These statistics led Chaplain Ellis to make the following statements:

the conclusions to be drawn are so clear as to make any such discrepancies inconsequential. There is no suggestion that this pattern was deliberate. However the institutional bias is very clear.

. . . the relative frequency of assignment of liturgicals to key decision making billets is disconcerting. . . . Why is this important? First, it is an issue of justice. Secondly, the ability of the chief of chaplains to proclaim a vision that will be followed requires a sense of trust in the fairness of his administration of the affairs of the Corps. Thirdly, the Ecclesiastical Endorsers from the non-liturgical Churches, while not organized, are increasingly disenchanted with what they believe to be the unfair treatment of their chaplains. Fourthly, and perhaps most importantly, when only one perspective is reinforced to decision mak-

ers, and even those few non-liturgicals who are given key billets are there because they have been able to be non-confrontive [sic], the strength of diversity, which we tout to be so important, is unable to be realized. The thrust of the Chaplain Corps policies is thus skewed by incomplete perspective; perspective that perhaps could be supplied by the silent, in terms of position and influence, non-liturgicals.

Compl., Ex. 4.

The defendants articulate no compelling governmental objective for listing a promotion candidate's religious affiliation. The court therefore concludes that the plaintiffs have stated a Fifth Amendment equal-protection claim that identifying a candidate's religious affiliation to the chaplain promotion board violates strict scrutiny and thus denies the defendants' motion to dismiss this claim.[27]

### 3. Implementing a Liturgical Protestant "General Service"

The plaintiffs allege that the Navy's policy of having only a "general Protestant" service and restricting other forms of non-liturgical religious services violates both the First Amendment's Establishment Clause and the Free Exercise Clause. *See* Compl. at 35. They claim that the defendants have tried to establish a de facto liturgical religion for its personnel, thereby limiting the opportunity for non-liturgical

Navy personnel to meet their religious needs. *See id.* In addition, the non-liturgical Christian chaplains assert that by mandating a liturgical "general Protestant" service, the Navy has tried to shape all Protestant servicemen and women "into a single liturgical worship mold while ignoring or actively hindering the religious needs of non-liturgical personnel." *Id.* The Navy has allegedly done this by denying or restricting non-liturgical Christian chaplains' access to Navy facilities to conduct services, by removing non-liturgical chaplains from preaching or conducting religious services and by opposing non-liturgical Christian worship alternatives. *See id.*

■ Turning first to the plaintiffs' Free Exercise Clause claims, the court rules that the plaintiffs have standing only to challenge the Navy's policies and practices on behalf of the current and former non-liturgical Christian chaplain plaintiffs themselves (and possibly, a class of similarly situated current and former non-liturgical chaplains, if the court approves the anticipated motion for class certification). The defendants correctly point out that the plaintiffs do not have standing to bring a claim that the Navy has violated the rights of DON personnel to the free exercise of religion. *See* Mot. to Dismiss at 27 n. 16. As the Supreme Court has held, "[i]n the ordinary course, a litigant

---

**27.** It is worth noting that although two of the plaintiffs' claims may seem to be inconsistent at first glance, they do indeed mesh together. On the one hand, the plaintiffs ask the court to order the Navy to bring its Chaplain Corps, including its current rank structure, "into line with the Navy's religious demographics." *See* Compl. at 59; Mot. to Dismiss at 8. Needless to say, to do this, the Navy would have to consider a chaplain's religious affiliation. At the same time, however, the plaintiffs ask the court to order the Navy not to consider a chaplain's denomination in considering which chaplains to promote. *See* Compl. at 37. The court views these two positions as entirely consistent. The plaintiffs seek a proportional-representation system because they believe this would help meet the free-exercise needs of DON personnel and would prevent an unconstitutional establishment of liturgical Christianity in the Chaplain Corps. At the same time, the plaintiffs can consistently argue that a chaplain's denomination should not factor into the decision as to whether she receives a promotion.

must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio,* 499 U.S. 400, 410, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). The court has allowed litigants to bring actions on behalf of third parties only when the litigant has met three important criteria: (1) the litigant must have suffered an "injury in fact"; (2) the litigant must have a close relation to the third party; and (3) "there must exist some hindrance to the third party's ability to protect his or her own interests." *See id.* at 410–11, 111 S.Ct. 1364. Even assuming *arguendo* that the plaintiffs in this case could meet the first two criteria, they cannot meet the third since there is no reason why DON service members who feel that a general Protestant service violates their right to the free exercise of religion cannot bring their own lawsuit. Accordingly, to the extent that any of the plaintiffs' claims can be construed as a challenge brought by DON personnel, the court concludes that the plaintiffs lack standing to bring these claims on behalf of these third parties and grants the defendants' motion to dismiss these claims.

▮ Conversely, the plaintiffs' claim that a general Protestant service violates the Establishment Clause survives the defendants' motion to dismiss. The defendants justify the alleged policy of having a general Protestant service by noting that because of the broad range of faiths of Navy personnel and the limited number of chaplains, the Chaplain Corps must structure its provision of worship services to fulfill the religious needs of as many DON personnel as possible. *See* Mot. to Dismiss at 25. Accordingly, the defendants note that "these resource constraints will often if not always make it impossible to hold a worship service at Naval facilities

for each serviceperson's particular faith ...." *Id.*

The court is well aware that the Navy has limited resources and a limited number of chaplains to assign to its various installations across the globe. And the court understands the defendants' stated objective in adopting a utilitarian approach, whereby the Navy uses its limited chaplain resources to try to accommodate a religious fit for as many of its personnel as possible. The plaintiffs' concern, however, is that these allegedly general Protestant services might too often reflect a liturgical Christian service, rather than offering a variety of services (and even if the Navy cannot offer a variety of services at one particular base, it might at least be able to do so at a worldwide level). This point carries significant weight in the court's view.

The plaintiffs charge that by offering a general Protestant service with a heavy dose of liturgical Christianity, the Navy has unconstitutionally communicated a message of endorsement for a specific religious tradition, in violation of the Establishment Clause. *See* Pls.' Opp'n at 33. The plaintiffs agree with the defendants' stated goal that the Navy must utilize its limited resources to provide opportunities "that are acceptable to a broader segment of adherents than merely one denomination," but they properly point out that the defendants nowhere "explain how mandating a worship service that appeals to a tradition representing only 8% of the Navy somehow appeals to the *broader segment* made up of non-liturgicals." Pls.' Opp'n at 34.

The defendants respond by once again arguing that courts should defer to the military's "professional judgment" in these matters. *See* Mot. to Dismiss at 27. But as the court made clear in Section III.B., the strict-scrutiny standard applies to this

case and the question thus becomes whether the Navy's alleged policy of having a default general Protestant service with a liturgical Christian slant "is justified by a compelling governmental interest" and "is closely fitted to further that interest." *See Larson*, 456 U.S. at 246–47, 102 S.Ct. 1673. The court rules that the plaintiffs have stated a claim that this alleged policy is not justified by a compelling governmental interest and, even if it were, is not closely fitted to further that interest. The court therefore denies the defendants' motion to dismiss this count.[28]

### 4. Free Exercise Claims and Religious Speech

There is considerable overlap between the plaintiffs' Establishment Clause claims, Equal Protection Clause claims, and Free Exercise Clause claims. The overriding theme that runs through all the claims relating to the plaintiffs' free exercise of their religion is that the Navy has adopted and implemented policies and practices that effectively silence non-liturgical Christian chaplains.

 These claims include: identifying a chaplain-promotion candidate's religion to the chaplain promotion board; forcing non-liturgical churches off base into "substandard facilities which were inadequate to hold the number of those wanting to attend, while Catholic and liturgical Protestants enjoyed spacious on post facilities", Compl. at 36; senior Catholic and liturgical Protestant chaplains intentionally giving some non-liturgical Christian chaplains lower performance ratings than similarly

situated Catholic and liturgical Protestant chaplains "solely on the basis of their religious identification and beliefs despite evidence of the non liturgical chaplains' superior performance", *see id.* at 46; requiring non-liturgical Christian chaplains to officiate at liturgical Protestant services, but not requiring liturgical Protestant chaplains to officiate at non-liturgical services, *see id.;* implementing a two-tiered system of discipline, whereby liturgical members receive lighter punishments for similar offenses than non-liturgical chaplains, *see id.* at 47; providing career-planning information to liturgical Christian chaplains but not to non-liturgical Christian chaplains, *see id.;* and limiting the ability of non-liturgical Christian chaplains to meet their community's religious needs since "non-liturgical chaplains must expend more effort to meet the needs of their faith group members than is required by liturgical Protestant chaplains." *Id.*

In all these allegations, the plaintiffs charge that because the Navy treats non-liturgical Christian chaplains less favorably, the defendants' policies and practices serve to impair or impede the plaintiffs' free exercise of religion. Because the plaintiffs have stated a claim that these policies and practices do not pass the strict-scrutiny test, these allegations survive the defendants' motion to dismiss.

Finally, the plaintiffs plead that the Navy's policies and practices amount to an unconstitutional abridgement of religious speech with a specific viewpoint, i.e., non-

---

**28.** On a separate point, the defendants contort the plaintiffs' claim into one that supposedly pleads that the non-liturgical Christian chaplains do not want to provide for the religious needs of DON personnel outside of their own particular faith. *See* Reply at 19–20. The defendants say that "subjecting Navy personnel to narrow services that promote one particular religious position when other services are not offered, could risk violating the Establishment Clause." Mot. to dismiss at 26. The defendants' argument is misleading. After all, the essence of the plaintiffs' allegation is that the Navy *is* violating the Establishment Clause by offering narrow services that promote one particular religious position when the Navy is not offering other services.

liturgical, evangelical, and low-church. *See* Compl. at 42. Specifically, the plaintiffs assert that senior officials in the Chaplain Corps have criticized and berated non-liturgical chaplains "for preaching and teaching on truths of the Christian faith and their specific religious tradition." *See id.* at 35. In another instance, a senior liturgical Christian chaplain allegedly disciplined a non-liturgical chaplain for ending his prayers by saying "in Jesus [sic] name." *See id.* at 6.

The defendants counter that any actions they have taken were done solely to try to maximize limited resources to provide for the ministry needs of the Navy. *See* Mot. to Dismiss at 3. In addition, the defendants rely heavily on a Seventh Circuit opinion, holding that a government-hospital chaplain "has no absolute constitutional right to conduct religious services and offer religious counsel in a government institution .... " *Baz v. Walters*, 782 F.2d 701, 708 (7th Cir.1986). Without addressing what specific restrictions the Navy may impose on the speech of its chaplains, the court notes that the *Baz* case is largely inapplicable to the case at bar. In that case, the Seventh Circuit affirmed the district court's finding that Reverend Franklin Baz, formerly a chaplain of the United States Veterans Administration ("VA") who worked at a hospital containing many psychiatric patients, had serious "difficulty in the discharge of his duties." *See id.* at 703. Among other things, Reverend Baz accepted honoraria for conducting funerals and borrowed money from patients to buy gasoline, both in violation of VA regulations, and, most significantly, continuously tried to proselytize his patients, also in violation of VA regulations. *See id.*

Citing the Supreme Court's declaration that when a government employee asserts that the government has infringed his constitutional rights, the court must strike a balance between the employee's interests as a citizen and "the interest of the [government] as an employer, in promoting the efficiency of the public services it performs through its employees," *see Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Seventh Circuit affirmed the district court's judgment for the defendants. *See Baz*, 782 F.2d at 709. The most notable difference between *Baz* and the case at bar is that in the latter, the defendants do not argue that the plaintiffs have, for example, violated any Navy regulations, committed any type of misconduct, or tried to proselytize or do anything else improper in conducting their worship services. While both *Baz* and *Pickering* can be read for the proposition that the government may place some time, place, and manner restrictions on the speech of government-employed chaplains, this court need not decide what the boundaries of those limitations should be in this case at this juncture.

The issue of what restrictions the Navy may place on the content of its chaplains' speech is a fascinating one, standing at the intersection of four major jurisprudential roads—free speech, free exercise, establishment, and equal protection. One readily apparent point is that the Constitution prevents the Navy from regulating the religious speech of non-liturgical Christian chaplains but not that of liturgical Christian or Catholic chaplains. Such conduct would communicate a message that some religious speech is favored over others, a message that some chaplains are not allowed to conduct their worship services as freely as others, a message that the Navy does not treat its chaplains of different faiths in an equitable matter and a message that the Navy endorses a specific religion. Since this is precisely what the plaintiffs allege that the Navy has done in this case, the plaintiffs have stated a claim

that the Navy's alleged policies and practices in this regard do not survive strict scrutiny and would violate the plaintiffs' freedom of speech, right to the free exercise of their religion, right to equal protection, and the Establishment Clause.[29]

### F. Individual Plaintiffs' Claim for Constructive Discharge

■ In their motion to dismiss, the defendants maintain that certain named plaintiffs fail to establish a prima-facie case of constructive discharge in the complaint. *See* Mot. to Dismiss at 33. To establish a claim for constructive discharge, the plaintiffs must not only show discrimination but also that the employer deliberately made work conditions intolerable, leading the employee to quit involuntarily. *See id.* at 33 (citing *Katradis v. Dav-El of Washington, D.C.*, 846 F.2d 1482, 1485 (D.C.Cir.1988)). The defendants note that the plaintiffs must allege both "discrimination and the existence of certain 'aggravating factors.'" *See id.* at 34 (quoting *Mungin v. Katten Muchin & Zavis,* 116 F.3d 1549, 1558 (D.C.Cir.1997)).

While the defendants are correct on the substantive law, they are wrong on the civil procedure. As the D.C. Circuit held in the very significant case, *Sparrow v. United Air Lines, Inc.,* "a plaintiff need not set forth the elements of a prima facie case at the initial pleading stage." 216 F.3d 1111, 1113 (D.C.Cir.2000). Accordingly, the plaintiffs at bar have no obligation to lay out a prima-facie case of constructive discharge in their complaint. The court therefore denies the defendants' motion on this point.

### G. The Court Orders Additional Briefing on Several Claims

The court will order further briefing on several of the plaintiffs' claims that the parties' briefs do not sufficiently address. The defendants shall file a supplemental motion to dismiss, if they so choose, laying out their position on the following issues: the plaintiffs' claim of illegal retaliation, as set forth in Count 11; the plaintiffs' claim of a violation of the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.;* and the plaintiffs' claim concerning the Chief of Chaplains' role in the chaplain-promotion process, as discussed on pages 37–38 (¶¶ 46–49) of the amended complaint. The defendants do not address this last claim or the retaliation claim in their motion to dismiss or in their reply and only address the RFRA claim in a footnote. *See* Mot. to Dismiss at 20 n. 13.[30]

### H. Additional Motions

In addition to the defendants' motion to dismiss, the parties have filed other motions. Because the court has now resolved the defendants' motion to dismiss, the court denies as moot the defendants' motion to hold the proceedings in abeyance until the court resolves the motion to dismiss. As noted in the court's order dated September 28, 2001, the court denies without prejudice the plaintiffs' motion for par-

---

**29.** The only other Establishment Clause claim set forth by the plaintiffs is that the defendants have violated Congress's tax and spending powers because Congress funds the Chaplain Corps, whose policies violate the Establishment Clause. *See* Compl. at 45. The court agrees with the defendants that "[t]his count is not a separate constitutional claim, but is simply another way for plaintiffs to attempt to establish standing to raise [their] Establishment Clause challenges ...."

Mot. to Dismiss at 27–28 n.17. Accordingly, the court grants the defendants' motion to dismiss this putative claim.

**30.** The defendants' motion addressing all these issues shall not exceed 10 pages, the plaintiffs' opposition shall not exceed 10 pages, and the defendants' reply shall not exceed seven pages. A time frame for filing these briefs is set forth in the attached order.

tial summary judgment that was filed as part of the plaintiffs' opposition to the defendants' motion to dismiss. *See* Order dated September 28, 2001. The court agrees with the defendants that they should be entitled to have a full briefing period on the plaintiffs' motion. Accordingly, the schedule laid out in the court's September 28, 2001 order now controls briefing on both of the plaintiffs' motions for partial summary judgment. *See id.*

Lastly, the court denies without prejudice the plaintiffs' motion to allow a chaplain plaintiff to proceed with the litigation using a pseudonym. The plaintiffs have indicated that if any part of the complaint survives the motion to dismiss, they will file a motion for class certification, which would moot the need for the plaintiffs to pursue their motion to allow a plaintiff to use a pseudonym. Accordingly, if the court denies the anticipated motion for class certification, the court will grant the plaintiffs leave to refile their motion to allow a plaintiff to use a pseudonym.

## IV. CONCLUSION

For all these reasons, the court denies in part and grants in part the defendants' motion to dismiss. In addition, the court denies as moot the defendants' motion to hold the proceedings in abeyance, denies without prejudice the plaintiffs' motion for partial summary judgment, and denies without prejudice the plaintiffs' motion to allow a chaplain plaintiff to use a pseudonym. An order directing the parties in a fashion consistent with this Memorandum Opinion is separately and contemporaneously issued this _____ day of January, 2002.

*ORDER*

DENYING IN PART AND GRANTING IN PART THE DEFENDANTS' MOTION TO DISMISS; DENYING AS MOOT THE DEFENDANTS' MOTION TO HOLD THE PROCEEDINGS IN ABEYANCE; DENYING WITHOUT PREJUDICE THE PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT; DENYING WITHOUT PREJUDICE THE PLAINTIFFS' MOTION TO ALLOW A CHAPLAIN PLAINTIFF TO USE A PSEUDONYM

For the reasons stated in this court's Memorandum Opinion separately and contemporaneously issued this 10th day of January, 2002, it is hereby

**ORDERED** that the defendants' motion to dismiss the plaintiffs' claims involving the hiring and retention of chaplains is **DENIED**; and it is

**FURTHER ORDERED** that the defendants' motion to dismiss the plaintiffs' claims relating to the Navy's promotion of chaplains is **DENIED in part** and **GRANTED in part**; and it is

**ORDERED** that the defendants' motion to dismiss the plaintiffs' claim involving the Navy's alleged implementation of a liturgical Protestant "general service" is **DENIED**; and it is

**FURTHER ORDERED** that the defendants' motion to dismiss the plaintiffs' claims relating to the plaintiffs' religious speech and the free exercise of their religion is **DENIED**[1]; and it is

**ORDERED** that the defendants' motion to dismiss the plaintiffs' claim for constructive discharge is **DENIED**; and it is

**FURTHER ORDERED** that the parties shall further brief several of the plaintiffs' claims that the briefs do not sufficiently address. Specifically, the de-

---

1. Although the court notes that, as discussed in the accompanying Memorandum Opinion, the plaintiffs may not bring any free exercise claims on behalf of Navy service members, but only on their own behalf.

fendants shall file a supplemental motion to dismiss, if they so choose, laying out their position on the following issues: the plaintiffs' claim of illegal retaliation, as set forth in Count 11; the plaintiffs' claim of a violation of the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*; and the plaintiffs' claim concerning the Chief of Chaplains' role in the chaplain-promotion process, as discussed on pages 37–38 (¶¶ 46–49) of the amended complaint. The defendants' motion addressing all these issues shall be filed within 30 days from the date the court issues this Memorandum Opinion and Order and shall not exceed 10 pages, the plaintiffs' opposition shall be filed within 30 days from the filing date of the defendants' submission and shall not exceed 10 pages, and the defendants' reply shall be filed within 15 days from the previous filing date and shall not exceed seven pages.

In addition, it is

**ORDERED** that the defendants' motion to hold the proceedings in abeyance until the court resolves the motion to dismiss is **DENIED as moot**; and it is

**FURTHER ORDERED** that the plaintiffs' motion for partial summary judgment is **DENIED without prejudice**[2]; and it is

**ORDERED** that the plaintiffs' motion to allow a chaplain plaintiff to use a pseudonym is **DENIED without prejudice**.

**SO ORDERED**.[3]

---

2. The timetable the court laid out in its September 28, 2001 Order for briefing on the plaintiffs' motion for partial summary judgment shall now control briefing on both of the plaintiffs' motions for partial summary judgment.

3. This Order should be read in conjunction with the court's September 28, 2001 Order.